## DECLARATION OF SPECIAL AGENT BENNETT E. STRICKLAND

Pursuant to 28 U.S.C. § 1746 and the laws of the United States, I, Bennett E. Strickland, declare under penalty of perjury that the following information is true and correct to the best of my knowledge and belief:

1. I am employed as a Special Agent of the Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been employed in this capacity since March, 2005. I am currently assigned to the Charlotte Field Office (Raleigh, North Carolina Post of Duty) and am responsible for investigating criminal violations of the Internal Revenue Code; the currency reporting requirements; the money laundering statutes; false, fictitious, or fraudulent claims; and conspiracy to defraud the government with respect to such claims.

2. During the course of my career as a Special Agent, I have participated in numerous investigations of alleged criminal violations of these statutes. I have completed Criminal Investigator School and the IRS-CI Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, GA. I have successfully passed the Maryland Certified Public Accountancy exam and have approximately eleven years of experience as both an accountant and auditor for various corporations and limited liability firms.

3. The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in a criminal investigation and from other law enforcement officers who have been involved in this investigation (including additional IRS-CI agents and special agents of United States Secret Service (USSS), and the Federal Deposit Insurance Corporation – Office of Inspector General (FDIC-OIG)).

4. Because this affidavit is submitted for the limited purpose of supporting the government's motion for preliminary order of forfeiture and for supporting the government's

1


GOVERNMENT EXHIBIT A

request for an order seizing assets, restraining assets, and/or compelling the disclosure of information in furtherance of recovery of forfeited assets, I have not included each fact known to me concerning this investigation. I have set forth the facts that I believe are essential to supporting the government's requests.

## I. FACTS OF THE INVESTIGATION

5. From approximately 2006 through 2013, Thomas defrauded his father, his wife, his father-in-law, and others out of millions of dollars.

6. Thomas's father, Ronnie Thomas, operated NC & VA Warranty, Inc. (hereinafter referred to as "NCVA"), a corporation located in Roxboro, North Carolina. NCVA sold vehicle service contracts through used automobile dealerships in North Carolina and Virginia. NCVA and NCVA affiliates were required to maintain certain reserve funds pursuant to certain insurance arrangements.

7. Thomas devised a scheme that included promising to invest the reserve funds owned by NCVA and their affiliates in United States Treasury Bills (hereinafter referred to as "T-bills"). Such low-risk investments were allowed by NCVA's insurance arrangements. During this time, Thomas similarly promised his wife, his father-in-law, and another NCVA affiliate, that he could employ the use of an algorithm to successfully invest their funds in T-bills as well.

8. Unbeknownst to all of his victims, Thomas had set up a system of shell companies and offshore affiliates that allowed him to surreptitiously engage in risky trading activity with the investors' funds rather than invest them in T-bills as he had promised. Thomas was listed as a "trader" on relevant accounts and authorized himself to trade in a variety of investment vehicles, including bonds, stocks, options, futures and foreign exchange.

9. Contrary to his representations and promises to investors, Thomas invested the

money in risky investment vehicles, such as futures, options, and foreign currency exchange. His risky trading activity resulted in investments losses of more than four and a half million dollars ($4,500,000) between 2006 and 2013. Thomas maintained his scheme by providing victims false information, misleading documents, and fabricated statements to cover up the true nature of his trades and to convince investors and banks that the money was invested in T-bills.

10. After experiencing significant investment losses, as well as continuously siphoning off material amounts of investor money to fund a lavish lifestyle, Thomas used false information and misleading documents to obtain three separate bank loans to continue this scheme. Thomas spent more than $1,600,000 of proceeds from these bank loans along with invested funds and misappropriated funds obtained directly from NCVA operating accounts to pay personal expenses as well as other expenses to keep the scheme afloat.

11. Due to Thomas's extended scheme, investment victims lost nearly all of their invested funds and NCVA was forced to close as a business. Two of Thomas' oldest victims, his father, Ronnie, and his father-in-law, William J. Stone, passed away nearly penniless.

12. Thomas obtained a total of $7,282,524.00 in proceeds through the implementation of his fraudulent scheme. Near and around the time Thomas' scheme was uncovered, the total balance in the investment account used by Thomas to perpetrate his fraud had been depleted to just $322,085.37. This amount in remaining funds was seized by the government during the course of the investigation.

13. The remaining balance of Thomas's proceeds—$6,960,438.63—was unrecoverable due to the acts and omissions of Thomas.

14. As indicated above, most of the proceeds were unrecoverable because the original value of the assets was substantially diminished due to Thomas's risky investments.

3

Thomas's investment activity resulted in losses in excess of $4,500,000.

15. In addition, approximately $890,000 was transferred to third parties by Thomas to fund his lavish lifestyle.

16. Any remaining amounts of the $6,960,438.63 in proceeds were unable to be located by the government upon the exercise of due diligence, which efforts included interviews of victims and review of their investment accounts, researching accounts controlled by Thomas both inside and outside the United States, interviewing bank and investment representatives, reviewing emails and other contact information for Thomas, and debriefing with Thomas' legal representatives.

## II. INDICTMENT AND GUILTY PLEA

17. On November 22, 2016, as a result of the fraudulent scheme described above, Thomas was indicted by a federal grand jury in the Eastern District of North Carolina on the following counts:

- fourteen (14) counts of wire fraud in violation of 18 U.S.C. § 1343;
- three (3) counts of bank fraud (and aiding and abetting) in violation of 18 U.S.C. § 1344 and 2;
- one (1) count of submitting false document to a financial institution (and aiding and abetting) in violation of Title 18 U.S.C. § 1014 and 2; and
- three (3) counts of unlawful money transactions (money laundering) in violation of Title 18 U.S.C. §1957.

18. On November 28, 2016, Thomas was arrested and has remained in custody since then.

19. Thomas was subsequently indicted by separate indictment on six (6) counts of

tax evasion in violation of Title 26 U.S.C. § 7201 and two (2) counts of willfully failing to file a Report of Foreign Bank and Financial Accounts in violation of Title 31 U.S.C. §§ 5314 and 5322(a). The unreported funds included both illegal investment fraud funds as well as legal funds obtained from investment signals. The case number for the separate case is No. 5:18-CR-87-1(4) in the United States District Court for the Eastern District of North Carolina.

20. On October 2, 2018, Thomas entered a guilty plea to one (1) count of wire fraud and one (1) count of tax evasion. In his written plea agreement, Thomas agreed to relinquish and forfeit $7,282,524.00, which Thomas agreed represented assets which facilitated and/or were acquired through unlawful activities.

21. Due to Thomas's acts or omissions resulting in the unavailability of $6,960,438.63 as described above, the government is seeking an order forfeiting other assets owned by Thomas as substitute assets pursuant to 21 U.S.C. § 853(p).

## III. SUBSTITUTE ASSETS - BITCOIN

22. During the course of the government's investigation into Thomas's criminal activity, investigators discovered that between approximately 2010 and 2015, separate and apart from his criminal scheme, Thomas was receiving income from two separate entities, Pro Trading, LLC and Markman Capital Insight, LLC (hereinafter referred to as "MCI"). Thomas provided investment signals to Pro Trading, LLC and MCI, who in turn provided these signals to their subscribing customers. The majority of this otherwise legitimately derived income was deposited into an offshore Cayman bank account. However, in January 2014, Thomas began having some of this income deposited to a Wells Fargo bank account (*7038) under the name of Mayfair Analytics, Ltd.[1]

---

[1] Investigators determined that Thomas had formed a new business entity named Mayfair Analytics, Ltd. Thomas opened Mayfair Analytics, Ltd. in January 2014 under a corporate registrant in Las Vegas,

5

23. A review of this account indicated that Thomas had used funds to purchase bitcoin. Bitcoin ("BTC") is a decentralized virtual currency, which is supported by a peer-to-peer network. All BTC transactions are posted to a public ledger, called the Blockchain (which can be seen at https://Blockchain.info). Although transactions are visible on the public ledger, each transaction is only listed by a complex series of numbers that do not identify the individuals involved in the transaction. This feature makes BTC pseudonymous; however, it is possible to determine the identity of an individual involved in a BTC transaction through several different tools that are available to law enforcement. For this reason, many criminal actors who use BTC to facilitate illicit transactions online (*e.g.*, to buy and sell drugs or other illegal items or services) look for ways to make their transactions even more anonymous.

24. Like an email address, a user can send and receive BTC with others by sending BTC to a BTC address. A BTC address functions much like a unique "account"; however, BTC is designed such that one person may easily operate many BTC accounts. People commonly have many different BTC addresses and an individual could theoretically use a unique address for every transaction in which they engage. A BTC user can also spend from multiple BTC addresses in one transaction; however, to spend BTC held within a BTC address, the user must have a private key, which is generated when the BTC address is created and shared only with the BTC-address key's initiator. Similar to a password, a private key is shared only with the BTC-address key's initiator and ensures secured access to the BTC. Consequently, only the holder of a private key for a BTC address can access BTC from the address. Although generally, the owners of BTC addresses are not known unless the information is made public by the owner (for

---

Nevada. Thomas had previously used corporate registrants to open a corporation and to operate his fraudulent scheme. Based on my experience, individuals involved in financial and tax fraud utilize corporate registrants and offshore companies to hide the true, beneficial owner(s) and to cover up their schemes.

6

example, by posting the BTC address in an online forum or providing the BTC address to another user for a transaction), analyzing the public transactions can sometimes lead to identifying both the owner of a BTC address and any other accounts that the person or entity owns and controls.

25. Bitcoin's network also supports multi-signature security protocols for the exchange of BTC. Under a multi-signature security arrangement, multiple private keys may be associated with a single BTC address, and to initiate a transaction from that address, a minimum number of those private keys is necessary (*e.g.*, three private keys exist for the address and a minimum of two private keys are necessary to initiate a transaction).

26. On August 1, 2017, BTC underwent a "fork" whereby the BTC blockchain split into two (2) separate branches. As a result of this fork, all addresses that owned BTC as of the date of the fork *also* received the same number of units in "Bitcoin Cash" (hereinafter referred to as "BCH"), a related virtual cryptocurrency that is registered through one of the "halves" of the split blockchain. As such, Thomas received an equal amount of BCH as he had in BTC, thus doubling his overall virtual currency units. Similar to BTC, BCH transacts on a blockchain with similar privacy characteristics and online capabilities that BTC and other virtual currencies offer.

27. BTC and BCH are often transacted using a virtual-currency exchange, which is a virtual-currency trading platform and bank. It typically allows trading between the U.S. dollar, other foreign currencies, BTC/BCH, and other digital currencies. Many virtual-currency exchanges also act like banks and store their customers' BTC/BCH. Because these exchanges act like banks, they are legally required to conduct due diligence of their customers and have anti-money laundering checks in place. Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act, codified at 31 U.S.C. § 5311 *et seq.*, and must

collect identifying information of their customers and verify their clients' identities. Some virtual-currency exchanges also offer multi-signature security arrangements.

28. Since the blockchain serves as a searchable public ledger of every BTC/BCH transaction, law-enforcement investigators may trace transactions to BTC/BCH exchanges. Because those exchanges collect identifying information about their customers, subpoenas or other appropriate process submitted to these exchangers can, in some instances, reveal the true identity of the individual responsible for the transaction.

29. In Thomas's case, investigators determined that Thomas purchased BTC through Coinbase.com ("Coinbase"), one such virtual currency exchange platform. Specifically, investigators determined that Thomas initially opened a virtual wallet with Coinbase using "userid" "5511ce8e1b8e1c51e500014c" and the e-mail address tlthomas@protonmail.ch.

30. In total, investigators have identified 279.5430135 BTCs and 279.5430135 BCHs owned by Thomas through Coinbase.[2] The value of BTC and BCH in U.S. dollars routinely fluctuates. As of February 1, 2019, one (1) BTC is valued at $3,421.72. Thus, as of February 1, 2019, the BTC owned by Thomas is valued at $956,973.16. BCH's value in U.S. dollars has fluctuated at a lower price point than BTC. As of February 1, 2019, one (1) BCH is valued at $114.21. Thus, as of February 1, 2019, the BCH owned by Thomas is valued at $31,926.61. Together Thomas's total wallet value, as of February 1, 2019, is $988,899.77.

31. Thomas's BTC and BCH are held with Coinbase in four (4) separate "wallets," which are similar to accounts; however, a single wallet may contain multiple BTC/BCH addresses.

32. Two of the wallets, known as "My Wallet" accounts, contain relatively small

---

[2] Thomas' Coinbase Wallet also includes $455.24 in U.S. dollars that have not been converted to BTC or BCH.

amounts of BTC and BCH. One "My Wallet" account contains approximately 17.5853405 BTC and the other "My Wallet" account contains 17.5853405 BCH. The virtual currencies are valued at approximately $60,172.11 for BTC and $2,008.42 for BCH as of February 1, 2019.

33. For the "My Wallet" accounts, it is my understanding that Coinbase retains the private keys to the BTC addresses associated with these accounts. As such, Coinbase has direct access to Thomas's "My Wallet" accounts and the BTC/BCH in these accounts may be seized or restrained through court order or warrant.

34. Thomas's two other accounts with Coinbase contain the vast majority of the BTC/BCH owned by Thomas. These accounts, known as "Multi-Signature Vaults," use a multi-signature security arrangement. One Multi-Signature Vault contains approximately 261.957673 BTC and the other contains approximately 261.957673 BCH.

35. Unlike the "My Wallet" accounts, Coinbase does not control the requisite private keys to access the BTC addresses in the Multi-Signature Vault accounts. Instead, for these accounts, three separate private keys are generated for each BTC address in the account. Coinbase retains one of the private keys for each address (the "Coinbase Key"). The customer is given one of the private keys for each address (the "Customer Key"). The third private key (the "Passphrase Key") is encrypted and stored with Coinbase, but Coinbase does not have the ability to unilaterally decrypt the key; instead, the customer is given a passphrase that allows them to access the private keys associated with the addresses in the vault. In order to access the Multi-Signature Vault accounts and initiate BTC transactions, two of the three keys are necessary.

36. The result of this multi-signature security arrangement is that to access the addresses in the Multi-Signature Vaults through Coinbase, the customer must either have (1) the

passphrase to "unlock" the Passphrase Key(s); or (2) the actual, lengthy alphanumeric Customer Key(s) for the BTC addresses associated with the Multi-Signature Vault.

37. In the typical case, the customer would log in to his Coinbase account with his Coinbase account password, then enter the passphrase to access the Multi-Signature Vault. Alternatively, if the customer retained the lengthy alphanumeric Customer Key, the customer could access the Multi-Signature Vault through Coinbase. In either of these two cases, the Coinbase Key functions as the first required key and the Passphrase Key or the Customer Key functions as the second required key

38. Because Coinbase only retains access to one of the private keys for the Multi-Signature Vault accounts, Coinabase does not have the ability to unilaterally access or turn over BTC/BCH associated with a Multi-Signature Vault.

39. There is another method by which the owner of the BTC could also access the BTC/BCH in a Multi-Signature Vault. When Coinbase initially generates the three private keys for each address in the Multi-Signature Vault, the "wallet" software that does so generates a seed phrase (the "Seed"). The Seed is typically a list of words that, when entered into the "wallet" software, allows a user to obtain *all three private keys* associated with each BTC address in the Multi-Signature Vault. When a customer establishes a Multi-Signature Vault with Coinbase, Coinbase provides the customer the Seed for the BTC addresses in the vault. Coinbase does not retain any access to the Seed.

40. Because the customer retains the Seed, the customer has the ability to unilaterally obtain all three private keys for the BTC addresses in the multi-signature vault without ever accessing his Coinbase account.

41. If the customer had obtained all three private keys, he could access the Bitcoin

network through a program or platform separate from Coinbase, enter two of the three private keys, and transfer the BTC/BCH to different BTC addresses—all without Coinbase's involvement. Coinbase would be powerless to stop the transfer. Such a transfer would also be extremely difficult to trace given the nature of BTC/BCH described above.

42. After the government learned of the existence of Thomas's Coinbase wallets, the government has requested that Thomas provide the necessary information (*i.e.*, passphrase, seed phrase, or private key(s)) to facilitate appropriate government action with respect to the BTC/BCH held by Coinbase. To date, and despite repeated requests, Thomas has refused to provide the Seed, Customer Key(s), or passphrase associated with his Multi-Signature Vault accounts to his defense counsel, to government attorneys, or to federal investigators.

## IV. ATTEMPTS TO ACCESS THOMAS'S COINBASE ACCOUNT

43. Investigators have learned from Coinbase that on multiple occasions since Thomas was indicted, a person has attempted to access the wallets containing Thomas's BTC/BCH. Specifically:

- In October 2017, a person attempted to log into Thomas's online Coinbase account without success.

- In August 2018, a person attempted to reset the password for Thomas's online Coinbase account without success.

- In September 2018, a person attempted to access Thomas's online Coinbase account through a two-factor authentication process that sent a message to Thomas's cell phone. However, the cell phone is currently in the government's possession, as it was seized by investigators shortly after Thomas's arrest. Thus, the access attempt was again unsuccessful.

44. During his incarceration, Thomas has already utilized a third-party intermediary outside of prison to conduct other financial transactions on his behalf. Specifically, he paid the wife of a person he met in prison to use his email address to direct numerous wire transfers at his request.

## V. CONCLUSION

45. As described above, investigators have identified a substantial amount of BTC/BCH owned by Thomas that is forfeitable as substitute assets in lieu of the $6,960,438.63 in criminal proceeds dissipated, transferred, or otherwise made unavailable by Thomas.

46. The nature of BTC/BCH, the attempts to access Thomas's account, and Thomas's pattern of behavior while incarcerated create a significant risk that if the BTC/BCH is not immediately seized or restrained, and/or Thomas is not compelled to disclose information necessary to facilitate such seizure or restraint, the BTC/BCH will be dissipated to the detriment of the United States' interest in the BTC/BCH as forfeited property.

47. Furthermore, unlike other types of liquid assets held at a bank, the nature of BTC/BCH creates a substantial risk that if the BTC/BCH is in fact dissipated, it will be very difficult to trace the BTC/BCH to other assets, accounts, or third parties.

48. In addition, over the last three months, the U.S. dollar value for both BTC and BCH have significantly fallen by nearly 50% and 70%, respectively. This has resulted in significant loss of value of the substitute assets. Compelling Thomas to disclose the passphrase, the Seed, and/or his Customer Key(s) to facilitate seizure of the BTC/BCH will allow the United States to swiftly convert the BTC/BCH to U.S. dollars and thereby preserve the assets' value.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Bennett Strickland*, Special Agent
Internal Revenue Service
Criminal Investigation