# DECLARATION OF SPECIAL AGENT BENNETT E. STRICKLAND

Pursuant to 28 U.S.C. § 1746 and the laws of the United States, I, Bennett E. Strickland, declare under penalty of perjury that the following information is true and correct to the best of my knowledge and belief:

1. I am employed as a Special Agent of the Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been employed in this capacity since March, 2005. I am currently assigned to the Charlotte Field Office (Raleigh, North Carolina Post of Duty) and am responsible for investigating criminal violations of the Internal Revenue Code; the currency reporting requirements; the money laundering statutes; false, fictitious, or fraudulent claims; and conspiracy to defraud the government with respect to such claims.

2. During the course of my career as a Special Agent, I have participated in numerous investigations of alleged criminal violations of these statutes. I have completed Criminal Investigator School and the IRS-CI Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, GA. I have successfully passed the Maryland Certified Public Accountancy exam and have approximately eleven years of experience as both an accountant and auditor for various corporations and limited liability firms.

3. The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in a criminal investigation and from other law enforcement officers who have been involved in this investigation (including additional IRS-CI agents and special agents of United States Secret Service (USSS), and the Federal Deposit Insurance Corporation – Office of Inspector General (FDIC-OIG)).

4. Because this affidavit is submitted for the limited purpose of supporting the government's motion for preliminary order of forfeiture, I have not included each fact known to

me concerning this investigation. I have set forth the facts that I believe are essential to supporting the government's requests.

## I. FACTS OF THE INVESTIGATION

5. From approximately 2006 through 2013, Thomas defrauded his father, his wife, his father-in-law, and others out of millions of dollars.

6. Thomas's father, Ronnie Thomas, operated NC & VA Warranty, Inc. (hereinafter referred to as "NCVA"), a corporation located in Roxboro, North Carolina. NCVA sold vehicle service contracts through used automobile dealerships in North Carolina and Virginia. NCVA and NCVA affiliates were required to maintain certain reserve funds pursuant to certain insurance arrangements.

7. Thomas devised a scheme that included promising to invest the reserve funds owned by NCVA and their affiliates in United States Treasury Bills (hereinafter referred to as "T-bills"). Such low-risk investments were allowed by NCVA's insurance arrangements. During this time, Thomas similarly promised his wife, his father-in-law, and another NCVA affiliate, that he could employ the use of an algorithm to successfully invest their funds in T-bills as well.

8. Unbeknownst to all of his victims, Thomas had set up a system of shell companies and offshore affiliates that allowed him to surreptitiously engage in risky trading activity with the investors' funds rather than invest them in T-bills as he had promised. Thomas was listed as a "trader" on relevant accounts and authorized himself to trade in a variety of investment vehicles, including bonds, stocks, options, futures and foreign exchange.

9. Contrary to his representations and promises to investors, Thomas invested the money in risky investment vehicles, such as futures, options, and foreign-currency exchange. His risky trading activity resulted in investment losses of more than four and a half million

dollars ($4,500,000) between 2006 and 2013. Thomas maintained his scheme by providing victims false information, misleading documents, and fabricated statements to cover up the true nature of his trades and to convince investors and banks that the money was invested in T-bills.

10. After experiencing significant investment losses, as well as continuously siphoning off material amounts of investor money to fund a lavish lifestyle, Thomas used false information and misleading documents to obtain three separate bank loans to continue this scheme. Thomas spent more than $1,600,000 of proceeds from these bank loans along with invested funds and misappropriated funds obtained directly from NCVA operating accounts to pay personal expenses as well as other expenses to keep the scheme afloat.

11. Due to Thomas's extended scheme, investment victims lost nearly all of their invested funds and NCVA was forced to close as a business. Two of Thomas' oldest victims, his father, Ronnie, and his father-in-law, William J. Stone, passed away nearly penniless.

12. Thomas obtained a total of $7,282,524.00 in proceeds through the implementation of his fraudulent scheme. Near and around the time Thomas' scheme was uncovered, the total balance in the investment account used by Thomas to perpetrate his fraud had been depleted to just $322,085.37. This amount in remaining funds was seized by the government during the course of the investigation.

13. The remaining balance of Thomas's proceeds—$6,960,438.63—was unrecoverable due to the acts and omissions of Thomas.

14. As indicated above, most of the proceeds were unrecoverable because the original value of the assets was substantially diminished due to Thomas's risky investments. Thomas's investment activity resulted in losses in excess of $4,500,000.

15. In addition, approximately $890,000 was transferred to third parties by Thomas

to fund his lavish lifestyle.

16. Any remaining amounts of the $6,960,438.63 in proceeds were unable to be located by the government upon the exercise of due diligence, which efforts included interviews of victims and review of their investment accounts, researching accounts controlled by Thomas both inside and outside the United States, interviewing bank and investment representatives, reviewing emails and other contact information for Thomas, and debriefing with Thomas' legal representatives.

## II. INDICTMENT AND GUILTY PLEA

17. On November 22, 2016, as a result of the fraudulent scheme described above, Thomas was indicted by a federal grand jury in the Eastern District of North Carolina on the following counts:

- fourteen (14) counts of wire fraud in violation of 18 U.S.C. § 1343;
- three (3) counts of bank fraud (and aiding and abetting) in violation of 18 U.S.C. § 1344 and 2;
- one (1) count of submitting false document to a financial institution (and aiding and abetting) in violation of Title 18 U.S.C. § 1014 and 2; and
- three (3) counts of unlawful money transactions (money laundering) in violation of Title 18 U.S.C. §1957.

18. On November 28, 2016, Thomas was arrested and has remained in custody since then.

19. Thomas was subsequently indicted by separate indictment on six (6) counts of tax evasion in violation of Title 26 U.S.C. § 7201 and two (2) counts of willfully failing to file a Report of Foreign Bank and Financial Accounts in violation of Title 31 U.S.C. §§ 5314 and

5322(a). The unreported funds included both illegal investment fraud funds as well as legal funds obtained from investment signals. The case number for the separate case is No. 5:18-CR-87-1(4) in the United States District Court for the Eastern District of North Carolina.

20. On October 2, 2018, Thomas entered a guilty plea to one (1) count of wire fraud and one (1) count of tax evasion. In his written plea agreement, Thomas agreed to relinquish and forfeit $7,282,524.00, which Thomas agreed represented assets which facilitated and/or were acquired through unlawful activities.

21. Due to Thomas's acts or omissions resulting in the unavailability of $6,960,438.63 as described above, the government is seeking an order forfeiting other assets owned by Thomas as substitute assets pursuant to 21 U.S.C. § 853(p).

### III. SUBSTITUTE ASSETS - BITCOIN

22. During the course of the government's investigation into Thomas's criminal activity, investigators discovered that between approximately 2010 and 2015, separate and apart from his criminal scheme, Thomas was receiving income from two separate entities, Pro Trading, LLC and Markman Capital Insight, LLC (hereinafter referred to as "MCI"). Thomas provided investment signals to Pro Trading, LLC and MCI, who in turn provided these signals to their subscribing customers. The majority of this otherwise legitimately derived income was deposited into an offshore Cayman bank account. However, in January 2014, Thomas began having some of this income deposited to a Wells Fargo bank account (*7038) under the name of Mayfair Analytics, Ltd.[1]

---

[1] Investigators determined that Thomas had formed a new business entity named Mayfair Analytics, Ltd. Thomas opened Mayfair Analytics, Ltd. in January 2014 under a corporate registrant in Las Vegas, Nevada. Thomas had previously used corporate registrants to open a corporation and to operate his fraudulent scheme. Based on my experience, individuals involved in financial and tax fraud utilize corporate registrants and offshore companies to hide the true, beneficial owner(s) and to cover up their schemes.

5

23. A review of this account indicated that Thomas had used funds to purchase bitcoin. Bitcoin ("BTC") is a decentralized virtual currency, which is supported by a peer-to-peer network. All BTC transactions are posted to a public ledger, called the Blockchain (which can be seen at https://Blockchain.info). Although transactions are visible on the public ledger, each transaction is only listed by a complex series of numbers that do not identify the individuals involved in the transaction. This feature makes BTC pseudonymous; however, it is possible to determine the identity of an individual involved in a BTC transaction through several different tools that are available to law enforcement. For this reason, many criminal actors who use BTC to facilitate illicit transactions online (*e.g.,* to buy and sell drugs or other illegal items or services) look for ways to make their transactions even more anonymous.

24. Like an email address, a user can send and receive BTC with others by sending BTC to a BTC address. A BTC address functions much like a unique "account"; however, BTC is designed such that one person may easily operate many BTC accounts. People commonly have many different BTC addresses and an individual could theoretically use a unique address for every transaction in which they engage. A BTC user can also spend from multiple BTC addresses in one transaction; however, to spend BTC held within a BTC address, the user must have a private key, which is generated when the BTC address is created and shared only with the BTC-address key's initiator. Similar to a password, a private key is shared only with the BTC-address key's initiator and ensures secured access to the BTC. Consequently, only the holder of a private key for a BTC address can access BTC from the address. Although generally, the owners of BTC addresses are not known unless the information is made public by the owner (for example, by posting the BTC address in an online forum or providing the BTC address to another user for a transaction), analyzing the public transactions can sometimes lead to

identifying both the owner of a BTC address and any other accounts that the person or entity owns and controls.

25. Bitcoin's network also supports multi-signature security protocols for the exchange of BTC. Under a multi-signature security arrangement, multiple private keys may be associated with a single BTC address, and to initiate a transaction from that address, a minimum number of those private keys is necessary (*e.g.*, three private keys exist for the address and a minimum of two private keys are necessary to initiate a transaction).

26. On August 1, 2017, BTC underwent a "fork" whereby the BTC blockchain split into two (2) separate branches. As a result of this fork, all addresses that owned BTC as of the date of the fork *also* received the same number of units in "Bitcoin Cash" (hereinafter referred to as "BCH"), a related virtual cryptocurrency that is registered through one of the "halves" of the split blockchain. As such, Thomas received an equal amount of BCH as he had in BTC, thus doubling his overall virtual currency units. Similar to BTC, BCH transacts on a blockchain with similar privacy characteristics and online capabilities that BTC and other virtual currencies offer.

27. BTC and BCH are often transacted using a virtual-currency exchange, which is a virtual-currency trading platform and bank. It typically allows trading between the U.S. dollar, other foreign currencies, BTC/BCH, and other digital currencies. Many virtual-currency exchanges also act like banks and store their customers' BTC/BCH. Because these exchanges act like banks, they are legally required to conduct due diligence of their customers and have anti-money laundering checks in place. Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act, codified at 31 U.S.C. § 5311 *et seq.*, and must collect identifying information of their customers and verify their clients' identities. Some virtual-currency exchanges also offer multi-signature security arrangements.

28. Since the blockchain serves as a searchable public ledger of every BTC/BCH transaction, law-enforcement investigators may trace transactions to BTC/BCH exchanges. Because those exchanges collect identifying information about their customers, subpoenas or other appropriate process submitted to these exchangers can, in some instances, reveal the true identity of the individual responsible for the transaction.

29. In Thomas's case, investigators determined that Thomas purchased BTC through Coinbase.com ("Coinbase"), one such virtual currency exchange platform. Specifically, investigators determined that Thomas initially opened a virtual wallet with Coinbase using "userid" "5511ce8e1b8e1c51e500014c" and the e-mail address tlthomas@protonmail.ch.

30. In total, investigators have identified 279.5430135 BTCs and 279.5430135 BCHs owned by Thomas through Coinbase.[2] The value of BTC and BCH in U.S. dollars routinely fluctuates, often by significant amounts even during a single day. As of July 2, 2019, the total value of Thomas's BTC and BCH at Coinbase in U.S. dollars is $2,906,167.52.

## IV. SUBSTITUTE ASSETS – FUNDS FROM WELLS FARGO ACCOUNT *7038

31. As referenced earlier, during the course of the investigation into Thomas, law enforcement learned of a Wells Fargo bank account (Account 3421147038) held under the name of Mayfair Analytics, Ltd. It appears that Thomas had complete control of this entity and the funds that were in the Wells Fargo bank account. Specifically, investigators determined that Thomas formed Mayfair Analytics, Ltd in January 2014 under a corporate registrant in Las Vegas, Nevada. Thomas had previously used corporate registrants to open a corporation and to operate his fraudulent scheme. Based on my experience, individuals involved in financial and tax fraud utilize corporate registrants and offshore companies to hide the true, beneficial

---

[2] Thomas' Coinbase Wallet also includes $455.24 in U.S. dollars that have not been converted to BTC or BCH.

owner(s) and to cover up their schemes.

32. As of May 6, 2019, the account balance on this account was approximately $21,386.00. Wells Fargo Bank originally attempted to close the account, but the settlement check for the funds was returned and was held by Wells Fargo Bank.

33. During the Government's investigation, Thomas has repeatedly requested that inmates whom he met in prison but who were subsequently released help him transfer the funds in the Wells Fargo bank account to other destinations to prevent the Government from obtaining the funds. He has used code language to refer to this account in recorded jail calls with third parties whose assistance he sought, including referring to the account as "the Lost Symbol."

34. The Government obtained a warrant to seize the funds associated with Wells Fargo Account No. 3421147038 on May 10, 2019. The Government subsequently seized $21,386.82 in funds associated with the account.

## V. SUBSTITUTE ASSETS – FUNDS FROM PROPER TITLE, LLC ESCROW

35. During the course of the Government's investigation into THOMAS's criminal activity, it also learned that THOMAS utilized one or more business entities, operated generally under variations of the trade name "Gemini," to provide investment advice to subscribing clients.

36. In or about the fall of 2016, THOMAS sought to conceal his Gemini assets while continuing to generate revenue. THOMAS initially attempted to park in excess of $700,000 in apparent Gemini funds in various trust accounts associated with law firms in an effort to continue operating Gemini without maintaining an operational bank account. The Government does not have any reason to believe that the primary purpose of placing these funds with the law firms was as a retainer for legal services. After the law firms refused to allow THOMAS to

9

Case 5:16-cr-00298-D   Document 131-1   Filed 07/02/19   Page 9 of 11

effectively use their trust accounts as a business operations account, between October 2016 and May 2017, those law firms transferred the funds to Proper Title, LLC, a title insurance company, who held Gemini's funds in multiple escrow accounts, even though the funds appeared unrelated to any real-property transaction. Additional wires from apparent Gemini clients were deposited in the Proper Title escrow accounts over time.

37. Over the course of 2017, THOMAS, using a former inmate whom THOMAS had met in prison and the former inmate's wife, transferred large sums of money from the Proper Title escrow accounts, including transfers to the former inmate and his wife. Eventually, after being contacted by the Government, the former inmate and his wife stopped assisting THOMAS in transferring funds from the Proper Title escrow accounts.

38. Thomas then sought the assistance of other individuals to transfer the assets from Proper Title.

39. As of May 10, 2019, the remaining assets held by Proper Title, LLC were in two escrow accounts with the following balances:

| | |
|---|---|
| Escrow Account PTE2016-0029 | $12,048.31 |
| Escrow Account PTE2016-0035 | $299,456.98 |
| **TOTAL:** | $311,505.29 |

40. The Government obtained a warrant to seize the funds associated with these two Proper Title, LLC escrow accounts on May 10, 2019. The Government subsequently seized $311,205.29 in funds associated with the accounts.

## VI. SUBSTITUTE ASSETS – PAYPAL

41. During the course of the Government's investigation, the Government also learned that Thomas had revealed to another inmate the existence of a PayPal account that

Thomas owned that he had registered under the name "Griffin Mill," a known alias of Thomas. THOMAS told the inmate the funds in the PayPal account came from his Gemini customers and directed the inmate to use this specific alias to contact PayPal and access the account after he was released.

42. The Government initially obtained a warrant to seize the funds in this PayPal account based on information provided by Thomas to the former inmate. However, there were inaccuracies in the account information available and the warrant was returned unexecuted.

43. After subsequent investigation, investigators discovered PayPal Account No. 2183196777430659640 registered under the name of Griffin Mill using the email address kaizengolfer@gmail.com, an email address known to have been used by Thomas. Other contact information associated with the account was known to be associated with Thomas, including the address.

44. The total balance in the PayPal account is $74,393.99. These funds continue to be held by PayPal.

## CONCLUSION

45. As described above, investigators have identified four categories of assets owned by Thomas that are forfeitable as substitute assets in lieu of the $6,960,438.63 in criminal proceeds dissipated, transferred, or otherwise made unavailable by Thomas.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Bennett Strickland, Special Agent
Internal Revenue Service
Criminal Investigation