**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| | )    5:16-CR-298-1D |
|      **vs.** | ) |
| | ) |
| **TREYTON LEE THOMAS,** | ) |
|      **Defendant.** | ) |
| | ) |

**JULY 1, 2019**
**MOTION HEARING**
**BEFORE THE HONORABLE JAMES C. DEVER III**
**UNITED STATES DISTRICT JUDGE**

<u>APPEARANCES</u>:

<u>On Behalf of the Government</u>:

**JOHN HARRIS, ASSISTANT U.S. ATTORNEY**
**SUSAN MENZER, ASSISTANT U.S. ATTORNEY**
**MELISSA KESSLER, ASSISTANT U.S. ATTORNEY**
**U.S. Attorney's Office**
**150 Fayetteville Street, Suite 2100**
**Raleigh, North Carolina 27601**

<u>On Behalf of the Defendant</u>:

**GEOFFREY R. WILLIS, Esq.**
**DYSART WILLIS, PLLC**
**507 N. Blount Street**
**Raleigh, North Carolina 27604**

**AMY M. CONDON, CRR, RPR, CSR**
**Official Court Reporter**
**United States District Court**
**Raleigh, North Carolina**
**Stenotype with computer-aided transcription**

I N D E X

## GOVERNMENT'S WITNESSES

BENNETT STRICKLAND

Direct Examination by Mr. Harris 7
Cross-Examination by Mr. Willis 40
Redirect Examination by Mr. Harris 53
Recross-Examination by Mr. Willis 56

(**Monday, July 1, 2019, commencing at 2:26 p.m.)**

**P R O C E E D I N G S**

THE COURT:  We're here today for a motion hearing pursuant to 18 United States Code, Section 3664(d).  The motion is at Docket Entry 115.

Good afternoon, Mr. Willis and Mr. Thomas.  Is the defense ready?

MR. WILLIS:  We are, Your Honor.

THE COURT:  Good afternoon, Ms. Menzer.  Is the Government ready -- or is Mr. Harris doing this?

MS. MENZER:  Yes, Your Honor.  Mr. Harris is going to be handling this.

THE COURT:  Mr. Harris, is the Government ready?

MR. HARRIS:  Yes, Your Honor.  Thank you.

THE COURT:  At this time I'd ask that Mr. Thomas be sworn or affirmed.

(The defendant, Treyton Lee Thomas, was duly sworn.)

THE COURT:  Mr. Thomas, do you understand that having been sworn, that your answers to my questions are subject to the penalty of perjury, sir; and if you were to lie to me, you could be prosecuted for perjury or for making a false statement, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you taken any kind of medicine or any other substance in the last 48 hours that would affect your

ability to hear and understand this proceeding, sir?

THE DEFENDANT: No, Your Honor.

THE COURT: Do you know why we're here today?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Mr. Willis, do you have any reason to doubt Mr. Thomas' competence to go forward today?

MR. WILLIS: No, Your Honor.

THE COURT: Mr. Harris, does the Government have any reason to doubt Mr. Thomas' competence to go forward today?

MR. HARRIS: No, Your Honor.

THE COURT: The Court does find that Mr. Thomas is competent.

Just so I can get a forecast from each side, Mr. Harris, how do you propose proceeding today?

MR. HARRIS: Thank you, Your Honor.

Yes. What the Government would propose is that we have the opportunity to present evidence. We would anticipate calling two witnesses; one, a Government agent, and we would also propose that we have the opportunity to call Mr. Thomas and question him using leading questions as an adverse witness.

THE COURT: Mr. Willis, does the defense plan to put on evidence?

MR. WILLIS: I don't intend to put on any evidence, Your Honor. For the record, I'll object to the Government calling Mr. Thomas in this hearing as a witness.

THE COURT:  Just based on his Fifth Amendment privilege?

MR. HARRIS:  Yes, Your Honor.

THE COURT:  Mr. Harris?

MR. HARRIS:  Yes, Your Honor.  The Government's position would be that although perhaps there could be a Fifth Amendment privilege that could be asserted, that this is information that would be relevant to the Court at sentencing, and so we would still ask that Mr. Thomas be called as a witness.  He can decline to answer each question I'm going to ask him with regard to his economic circumstances by asserting his Fifth Amendment privilege, but we don't think in this particular circumstance and in this particular hearing he can assert that as a blanket privilege.

THE COURT:  Mr. Willis, so essentially, they want to ask the question, have him assert the privilege and then argue an adverse inference at sentencing.  Do you have any objection to that?

MR. WILLIS:  I would just note my objection to them calling him, Your Honor.

This is sort of an unusual hearing.  Not only is he facing sentencing with this Court, but given the Government's allegations in their motion, the fact that he's previously filled out a financial disclosure with the United States Probation Office where the Court knows the cover sheet

indicates he signs under penalty of perjury, I think his testimony would arguably expose him not just to negative consequences at sentencing, but potentially also perjury charges. So I don't know how -- I appreciate the Government wants to call him, but my advice to him has to be that he assert his Fifth Amendment privilege not to incriminate himself.

THE COURT: Mr. Harris, how many questions do you have for him, would you anticipate?

MR. HARRIS: What I would anticipate would essentially be going through the financial affidavit that Mr. Thomas was obliged to fill out for the U.S. Attorney's Office pursuant to his plea agreement and in which he's refused to do. So this would be a simple listing of questions regarding his assets for the Court to determine his economic circumstances.

And the reason, Your Honor, why we wanted to have this hearing and have a chance to ask Mr. Thomas those questions is because, as we indicated in our motion and are prepared to offer evidence about, we have sincere concerns that so far we haven't got a full accounting of assets to date.

THE COURT: Okay. All right. Did you want to -- do you want to do any sort of forecast before you call your first witness, your Government witness?

MR. HARRIS: I can do a very brief forecast, Your Honor.

We intend to call IRS agent, the criminal investigations, Bennett Strickland. Mr. Strickland will essentially explain to the Court the investigative efforts that have gone on primarily post-guilty plea, after Mr. Thomas pled guilty in October of 2018 and describe his efforts and what he has learned about four categories of assets that Mr. Thomas owns or has control over, not all of which were disclosed to Probation or to the Government that we think are relevant for the Court to know and understand in considering issues of restitution and forfeiture in this case.

THE COURT: All right. You may call your first witness.

MR. HARRIS: Thank you, Your Honor.

The Government will call Bennett Strickland.

BENNETT STRICKLAND,

having been duly sworn, testified as follows:

THE COURT: Good afternoon, Agent.

THE WITNESS: Good afternoon.

THE COURT: You may examine the witness.

MR. HARRIS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HARRIS:

Q. Good afternoon, Agent Strickland. Can you just, once again, please state your full name for the record.

A. Bennett Everett Strickland.

Q.   Agent Strickland, where do you work and what do you do for a living?

A.   I'm a special agent with IRS criminal investigation, and we investigate primarily -- we investigate financial crimes, primarily tax evasion and money laundering.

Q.   How long have you been a special agent with the IRS?

A.   Little over 14 years.

Q.   Okay.  In your work as a special agent with the IRS, did you become involved in an investigation of a man named Treyton Thomas?

A.   Yes, sir.

Q.   Do you see Mr. Thomas in the courtroom today?

A.   I do.  He's the gentleman in the white, gray sweatsuit, sir.

Q.   Thank you.

     Approximately, when did you become involved in the investigation of Mr. Thomas?

A.   I became involved in May of 2013.

Q.   What was the nature of your involvement at that time?

A.   We were investigating a fraud, an investment fraud that Mr. Thomas was involved in regarding his family and other extended family members and his father's business.

Q.   Okay.  And as that investigation continued, did you investigate other potential crimes as well?

A.   As the investigation continued, we also involved tax

crimes as well.

Q.   At some point during the course of your investigation, did you learn that Mr. Thomas had pled guilty to certain federal crimes?

A.   Yes.

Q.   And when did that guilty plea occur?

A.   He signed a guilty plea in September of 2018, and he entered the guilty plea in October of 2018.

Q.   Okay.  Now, prior to that time, to September or October 2018, what kinds of things were you involved in, in terms of the investigation?

A.   Prior to that, we were preparing for trial.  We were gathering witnesses, going through evidence.  We had traveled out of the country to interview witnesses.  We were just extensively preparing for trial.

Q.   Okay.  Now, after Mr. Thomas pled guilty, did you continue to be involved in his case?

A.   Yes.

Q.   In what ways?

A.   We were preparing for sentencing and going through the potentials of what could take place at sentencing.

Q.   And during the course of preparing for sentencing, did you continue to investigate Mr. Thomas' assets?

A.   We did.

Q.   Okay.  Now, did Mr. Thomas provide the Government a

financial statement or financial affidavit after entering his guilty plea?

A.   No.

Q.   Okay.  Do you know whether the Government requested that he provide one?

A.   Yes.

Q.   Did the Government request that he provide one?

A.   Yes, the Government requested that he provide one.

Q.   And do you know if this was required under his plea agreement?

A.   It was.

Q.   Now, at some point after the guilty, as you're preparing for sentencing, was there a draft presentence investigative report or a draft PSR that was prepared?

A.   Yes.

Q.   Do you know about when the draft PSR was prepared?

A.   January of 2019.

Q.   Did you review that draft PSR?

A.   I did.

Q.   And did that draft PSR indicate whether Mr. Thomas had disclosed to probation all of his known assets?

A.   We found certain accounts that he had not disclosed.

Q.   And was there a specific reference in that draft PSR to bitcoin assets?

A.   No.

Q.   Well, let me go back and make sure we're talking about the same thing.  In the draft PSR, I think that there perhaps was a reference by the Probation Office that the Government had provided information about bitcoin; is that correct?

A.   Yes.

Q.   Okay.  But Mr. Thomas did not disclose that to Probation; does that sound right?

A.   Yes, sir.

Q.   So after you reviewed that draft PSR, what did you do?

A.   We proceeded to investigate any other accounts, as well as find out more information about the bitcoin.

Q.   At this point had you come to believe that Mr. Thomas owns assets in addition to bitcoin and in addition to Wells Fargo Bank account that he disclosed to Probation as reflected in that draft PSR?

A.   He does.

Q.   Can you identify for the Court all the assets, can identify them by category, that you currently believe that Mr. Thomas owns or controls?

A.   There's a Wells Fargo account that is in the name of Mayfair Analytics.  It's a company that Mr. Thomas started in 2014.  It's an investment company.

There's a PayPal account in the name of an alias Griffin Mill that belongs to Mr. Thomas and is related to a company that he started in the name of Gemini.

There is also an account at Proper Title, LLC, and there is, what we mentioned before, the bitcoin, that is with the online facilitator Coinbase.

Q. Okay. I want to walk through each of those categories of assets and have you explain how you came to learn about them and what you know about them.

Let's just start with the Wells Fargo account that you mentioned. How did you learn about the existence of this account?

A. We came across the Wells Fargo account during the investigation prior to the plea. As I mentioned before, it was in the name of Mayfair Analytics, an investment strategy that Mr. Thomas started in 2014, and it had approximately $21,863 as a balance in there.

Q. Do you know what the current status of those Wells Fargo funds are?

A. Pursuant to a warrant, the Government seized that amount.

Q. And do you know when approximately the Government seized those funds?

A. It was within the last couple of months it was seized.

Q. Now, I want to talk about the second category that you mentioned. You said, I believe, accounts associated with Proper Title; is that correct?

A. Yes, sir.

Q. Can you give the Court some background on Proper Title?

What is it?

A.   Proper Title is a limited liability company located in Chicago, Illinois; they are a title real estate company.

Q.   And what kind of accounts does Mr. Thomas have with Proper Title?

A.   Escrow.

Q.   How many accounts?

A.   He has three accounts; one of them doesn't have much -- anything in it or has very, very, miniscule amount; the other two have balances in there that were originated from fees that he received in relation to his business Gemini.  In other words, clients would pay him anywhere from 3 to $9,000 for an annual subscription for investment advice based on an algorithm.

Q.   And how did you learn about the existence of these Proper Title accounts?

A.   After Mr. Thomas was arrested in November of 2016, he went through a series of detention hearings or delays and we learned of a husband-and-wife team named Nancy and Dean Walker who there was talk of them becoming custodians for him.

Q.   And that would have been custodians as in he would have been taken into their care if he were released from detention?

A.   Yes, sir.

Q.   Okay.

A.   And we subsequently interviewed them separately and

learned that Mr. Thomas had actually spent time with the husband, Dean Walker, at Orange County Detention Center.  They overlapped for about a month.

Q.   I'm sorry to interrupt you, but Dean Walker was incarcerated at the same time; is that correct?

A.   Yes, sir.  So they became friends.  And through their relationship, Mr. Thomas had offered the Walkers some financial help if they would help him.

The agreement would be -- was that Mr. Thomas provided access to his -- he had several e-mail accounts related to his company Gemini and he wanted the Walkers, primarily Nancy, to send e-mails to customers of Gemini to keep -- to make the appearance that Gemini was still operational, even though Mr. Thomas was incarcerated.

Q.   What did he want the Walkers to tell the Gemini clients?

A.   He had mentioned -- he mentioned that -- he didn't want them to tell them he was in jail.  He mentioned that there was a -- Gemini was a large operation and that several employees were involved in a car accident and that there was also a computer hacking which caused a delay or a blip is the reason why the communication to his clients had faltered.

Q.   And as far as you know, were those stories about the car accident or computer hacking true?

A.   No.

Q.   Now, you said that he gave the Walkers access to the

e-mails associated with Gemini. Did he give them access to any funds?

A. Yes. He gave them access to -- so Ms. Walker would send e-mails as if she were Mr. Thomas, and Mr. Thomas would tell her what to write, and she would move funds from Proper Title to or request them from a different attorney at his behest.

Q. Okay. Now, at the time that the Walkers got involved with Mr. Thomas, about how much money total are we talking about that was in the Proper Title accounts?

A. Better than $700,000.

Q. Okay. And at this point or as of, you know, recently, when you were conducting this investigation after the plea, about how much money was in the Proper Title accounts?

A. After the plea, approximately 312,000. I think it was $311,505, give or take.

Q. Okay. And what's the current status of those funds?

A. Those funds have been seized by the Government pursuant to a warrant.

Q. And when did that occur?

A. It also occurred in the last couple of months.

Q. Okay. So you said there were 700 -- approximately 700,000 down to about 311,000.

Did the Walkers transfer any money to themselves?

A. They transferred approximately 268, $268,000 to themselves.

Q.   Okay.  Did you investigate what the Walkers did with these funds?

A.   Yes.  They operated -- or Mr. Walker operated a tree trimming business and some of the funds went to the tree trimming business, some of it went for personal use.  I believe they took a trip.

Q.   So they spent the funds, is that accurate?

A.   Yes, sir.

Q.   They're not holding onto those funds for Thomas' benefit, as far as you know?

A.   No, sir.

Q.   Are Dean and Nancy Walker still living?

A.   Nancy Walker is.  Unfortunately, Mr. Walker passed away in a car/road rage accident in Virginia.

Q.   Now, during your investigation of Mr. Thomas' assets after his plea, did you learn of any other attempts to transfer money out of the Proper Title accounts other than by the Walkers?

A.   We were researching or investigating bitcoin and others and we decided to listen to inmate phone calls; and through those inmate phone calls, we learned of Mr. Thomas reaching out to individuals that he had been incarcerated with, and some of those individuals were now released from prison and out and about, so he was reaching out to them to move funds as well.

Q.   You said you discovered this information from listening to inmate phone calls; is that right?

A.    Yes, sir.

Q.    Where were those phone calls coming from?

A.    This was when Mr. Thomas was housed at Meherrin River Regional Jail in Virginia.

Q.    And did the facility provide you the recordings of those calls?

A.    Yes.

Q.    Did you listen to those calls?

A.    Yes.

Q.    What timeframe generally were the calls that you were listening to?

A.    February to March of 2000 -- February to April 2019.

Q.    Okay.  Now, after listening to these calls between Mr. Thomas and former inmates, did you attempt to locate these former inmates with whom he was speaking?

A.    Yes.

Q.    And were you successful in locating some of them?

A.    We were on some of them.  We only had a name and phone number, but we were able to track down several of them.

Q.    All right.  Who did you locate first?

A.    One of the individuals was Elson David Primus who goes by -- I'll refer to him as his nickname -- Primus.  He was originally from New York, and he was housed with Mr. Thomas at Meherrin River Regional Jail and went back to New York after he was released.

Q.   And were Government agents able to speak with Mr. Primus?

A.   Yes.   We sent two IRS agents to speak with him in New York.

Q.   And what did those agents learn about Mr. Primus' involvement with Mr. Thomas?

MR. WILLIS:  At this time I'll object on confrontation grounds.

THE COURT:  Overruled.

Go ahead.

THE WITNESS:  Primus was essentially a go-between. Mr. Thomas would reach out to Primus and then Primus was to then contact another individual that had been incarcerated with them.  That individual's name is Alex Papadopoulos.  So, in essence, Mr. Thomas would reach out to Primus and then Primus would reach out to Alex.

Q.   Did Mr. Primus understand why Mr. Thomas was reaching out to Mr. Papadopoulos?

A.   They spoke -- Mr. Thomas spoke about a book deal, book dealer, also referred to something called the lost symbol; and essentially, these were code words for some of the funds that Mr. Thomas had.  Initially, we thought that he may be looking to maybe write a book or something, but then we subsequently found out these were code words for the accounts and funds that he had.

Q.   Okay.  After speaking with Mr. Primus, did you attempt to

locate this Alex Papadopoulos?

A.   We did.  We had contacted Mr. Papadopoulos in Virginia by way of his brother, left a card at his door and then his brother got in contact with me.  And then after meeting with his brother in Richmond, I was able to speak with Mr. Papadopoulos on the phone.

Q.   What did Mr. Alex Papadopoulos say about his involvement with Thomas?

A.   He also was housed with Mr. Thomas at Meherrin River Regional Jail, and Mr. Thomas was reaching out to him to essentially find the status of the balances in the Wells Fargo account, as well as in the Proper Title.

Now, Mr. Papadopoulos referred to the Proper Title account as the Striker Security account; however, Striker Security, we've subsequently contacted them and they were essentially just a platform to do the investments.  They did not house any funds.  So the refer to Striker I kind of -- it also means Proper Title.

Q.   Okay.  And did Mr. Papadopoulos also have familiarity with these code words that you were discussing?

A.   He clarified that when Mr. Thomas was speaking to him on the phone or anybody on the phone about book deal or book dealer or papers, that that referred to his accounts at Proper Title, and the lost symbol referred to his account at Wells Fargo.

MR. HARRIS: Your Honor, at this time, if you would allow it, I would like to play a portion of one of those jail calls. It's about four minutes, if you would like to hear it.

THE COURT: That's fine.

(Audio played in open court.)

BY MR. HARRIS:

Q. Now, Agent Strickland, are you familiar with that phone call?

A. Yes, I've listened to it before.

Q. Do you remember when that phone call was made?

A. In March. March 19th, 2019.

Q. And you listened to other phone calls originating from Mr. Thomas during the same time period; is that right?

A. Yes, sir.

Q. Was this call, just to be clear, before or after Mr. Thomas pled guilty to the crimes in this case?

A. This was after.

Q. And you recognize Mr. Thomas' voice?

A. I do.

Q. Who is he speaking with on this call?

A. He's speaking with Primus, Elson David Primus.

Q. Based on your investigation, what do you understand Thomas and Primus to be discussing?

A. Mr. Thomas is trying to get Primus to contact another individual, find out the status of the Wells Fargo account,

which he refers to as the lost symbol; and the status of the Proper Title account, which he refers to as the book deal.

Q.    And that other individual was Mr. Papadopoulos that you were discussing; is that right?

A.    Yes.

Q.    And did Mr. Papadopoulos explain what he would get in return to help access these accounts?

A.    He was initially tasked with finding the status of those accounts and trying to get into those accounts, and then he would -- once he did that, then he would get back in touch with Mr. Thomas, and then they had discussed that if he could, you know, move money out of those accounts for Mr. Thomas that he would receive a fee.  And Alex assumed that that fee would be a portion of the funds that he was trying to find the status of.

        THE COURT:  These are conversations between Alex Papadopoulos and the defendant, as to your understanding?

        THE WITNESS:  There was two phone calls -- he told us that he had two phone call.

        THE COURT:  "He" is Alex Papadopoulos?

        THE WITNESS:  Yes, Your Honor.  And I was able to listen to one phone call between Mr. Papadopoulos and Mr. Thomas.

        THE COURT:  Okay.  Mr. Harris, just make sure it's clear; instead of using pronouns, use the names of people. It's helpful to me to keep all these people straight.

MR. HARRIS: Yes, Your Honor.

THE COURT: Thank you.

BY MR. HARRIS:

Q. Agent Strickland, you mentioned that Mr. Papadopoulos had maybe two phone calls after he got out with Mr. Thomas; is that right?

A. Yes.

Q. Do you know if Mr. Thomas attempted to contact Mr. Papadopoulos more often than that?

A. In speaking to Mr. Papadopoulos, Mr. Papadopoulos said that he had received plus or minus 30 phone calls from Mr. Thomas; that eventually he just stopped returning Mr. Thomas' phone call, but Mr. Thomas didn't really get the gist that he didn't want to speak with him.

Q. And so that was what led to the call, for instance, that we just heard where Mr. Thomas was speaking with Mr. Primus attempting to contact Mr. Papadopoulos; is that right?

A. Yes, sir.

Q. So after you spoke with Mr. Primus and Mr. Papadopoulos, what did you do next in your investigation?

A. We reached out to Striker Securities as well as Proper Title to find out the status of those accounts.

Q. Okay. And had you previously spoken with representatives of Proper Title?

A. We had -- prior to the plea, we had sent agents out to

meet with Proper Title, and we had requested -- or excuse me, subpoenaed records from them based on the information we received from both Nancy and Dean Walker.

Q. Okay. Now, when you spoke to Proper Title in April of 2019, after listening to these phone calls and speaking with Mr. Primus and Mr. Papadopoulos, what did they tell you?

A. They -- in September of 2018, they had started to receive several e-mails regarding the accounts at Proper Title. The accounts were in the name of Gemini, which is the company that Mr. Thomas owned. These e-mails were purportedly coming from an individual by the name of Griffin Mill, and he was using an e-mail address geminitech@proton.com. And so we followed up with Proper Title and in speaking with their representatives, the account had pretty much remained stagnant for a long period of time, and then they started receiving these e-mails from Griffin Mill. They also -- and these e-mails were requesting that the funds be extracted or withdrawn.

Proper Title initially was concerned or had red flags about these e-mails; number one, because the e-mail geminitech@proton.com was not the original e-mail that set up the account; the account had remained stagnant for some time and it was also associated with the fact that we had sent agents out there in 2017. So they had e-mails back and forth with this Griffin Mill, but they did not release the funds.

Q. Now, did you obtain copies of this e-mail correspondence

between Proper Title representatives and this person purporting to be Griffin Mill?

A.   Yes, sir.

MR. HARRIS:   Your Honor, if I may approach the witness?

THE COURT:   You may.

BY MR. HARRIS:

Q.   Now, Agent Strickland, is the document that I've handed you that's marked as Government's Exhibit 1, are these the e-mails between the representatives of Proper Title and someone purporting to be Griffin Mill during the September timeframe you're just discussing?

A.   Yes, sir.

Q.   And if you'll look at the bottom just at page 2, there's an e-mail there from Gemini Tech; do you see that?

A.   Yes, sir.

Q.   And that's to Sue McManus?

A.   Yes.

Q.   And the e-mail address there, the Gemini Tech, is geminitech@protonmail.com; do you see that?

A.   Yes.

Q.   When you originally obtained these copies of these e-mails, did you recognize the protonmail.com suffix for the e-mail address?

A.   We were familiar with this from -- the e-mails that Mr.

Thomas provided to Nancy and Dean Walker.  They were also a name at protonmail.ch.

Q.   When you say he had provided those e-mails, you mean Mr. Thomas had given them credentials to access e-mail addresses that were also at ProtonMail?

A.   Yes.

Q.   Did you research and investigate proton and ProtonMail?

A.   Well, we attempted to, but they are -- they are based in Switzerland so we couldn't obtain e-mails directly from them.

Q.   When you received these e-mails, there in Government Exhibit 1, I believe you said earlier that these were attempts to wire money or transfer money out of the Proper Title accounts; is that right?

A.   Yes, sir.

Q.   Where did those requests ask that the money be sent to?

A.   To two different places.  At the bottom of the next page of Proper Title 1866, there's an e-mail reportedly from Griffin Mill to send $105,560 to Fort Bragg Federal Credit Union; and then on the very next page of Proper Title 1866, there's a subsequent e-mail -- or another e-mail that actually happened before the e-mail that I just talked about to send $92,534 to a different federal credit union called Red Stone Federal Credit Union.

Q.   And just for the record, the e-mail you're referring to that's there on the page of Proper Title 1868, that e-mail is

dated September 10th, 2018; is that right?

A.    Yes.

Q.    And that's the request to transfer to Red Stone?

A.    Yes.  It was to -- the account holder is Deana Reynolds.

Q.    And then flipping through the prior page, Proper Title 1866, that was the subsequent request and that e-mail is dated September 12th; is that right?

A.    Yes, sir.

Q.    So that's two days later?

A.    Yes, sir.

Q.    And that is the request to have money transferred to Fort Bragg Federal Credit Union?

A.    Yes, sir.

Q.    And that name is Travis Reynolds?

A.    He's the account holder.

Q.    Did you recognize those names, Travis and Deana Reynolds, initially when you saw those e-mails?

A.    No, sir.

Q.    Did you follow up on these names?

A.    We did.

Q.    What did you find out about Travis Reynolds?

A.    Travis Reynolds was a former soldier in the U.S. Army.  He was an intelligence analyst.  He had been in the Army for about five years.  He had served in both Iraq and Afghanistan. However, near the end of his time in the Army, he went absent

without leave and traveled to Montana and worked on a farm where Army criminal investigators eventually caught up with him, arrested him and brought him back to North Carolina.

He was brought back in July of 2018 and he was housed in Harnett County Detention Center until around September of 2018, which is -- at that point in time was the same facility that Mr. Thomas was at.

Q.   So he overlapped there at Harnett County Detention Center with Mr. Thomas?

A.   Yes.

Q.   Were you initially able to locate Travis Reynolds?

A.   No.

Q.   Did you follow up on the name Deana Reynolds?

A.   We were able to find her at her residence or her family's residence in Madison, Alabama.  And we sent two agents to meet with her, and they left a card and then she called them back and they went to meet with her subsequent to that.

Based on that conversation, we learned that Travis Reynolds and Deana Reynolds are estranged or separated, that they have two children together and that Mr. Reynolds had moved to California.

Q.   Okay.  Now, after contacting Deana Reynolds, were you able ultimately to make contact with Travis Reynolds?

A.   Yes, via phone.

Q.   And did Mr. Reynolds speak with you about his involvement

with Mr. Thomas while they were incarcerated together?

A.    He did.

Q.    What did he say?

A.    Mr. Reynolds told us that when he and Mr. Thomas were in Harnett County, that they were amongst several hard individuals; that the two of them sort of gravitated toward each other, and that what further brought them closer together was that Mr. Thomas would host trivia nights in which he would ask 20 or so questions to various inmates to answer, and Mr. Reynolds was -- told us that he was relatively good at this and answered a lot of the questions.  He later iterated that he thought that Mr. Thomas would hold these trivia to sort of find out who were some of the more intelligent people in the -- in their facility or in their area of the facility.

Q.    Okay.  Now, at some point did Mr. Thomas discuss money and his assets with Mr. Reynolds?

A.    He did.  Mr. Reynolds was not sure how long he was going to be at Harnett County, and he was -- he said he was at an emotional low point and he was speaking with his wife and Mr. Thomas had approached him, similar to the way he had approached others and said, Hey, I can help you out financially if you can help me out.  So they developed a relationship whereby Mr. Thomas provided him a written account on several pieces of paper of the assets and accounts and entities where these assets he held were.

Q.   Well, what assets did Mr. Thomas write out and list out for Mr. Reynolds?

A.   The ones that we spoke of earlier.  He wrote out the information -- detailed information about the Wells Fargo account, PayPal, Proper Title and Striker, as well as his assets at bitcoin.

Q.   Did Mr. Thomas still have those notes or this list when you spoke with him?  I'm sorry.  Mr. Reynolds.

A.   Those were in the possession of Deana Reynolds, so we asked if we could have those and we sent an agent back to Alabama and she consented to provide them to our Alabama agent, who then sent them to me.

Q.   And did you have an opportunity to speak further with Mr. Reynolds about the contents of those handwritten notes?

A.   Yes.  Mr. Reynolds agreed to come in and meet with an agent in California, and I spoke with them via phone.  The agent in California had a copy of those notes and we went through those notes over the phone.

Q.   And were there handwritten notations, circles or other things that were initialed to indicate -- I'm sorry, to differentiate between what was Mr. Thomas' handwriting and what Mr. Reynolds said was his handwriting?

A.   Yes.

          MR. HARRIS:  Your Honor, may I approach the witness?

          THE COURT:  You may.  Do you have exhibit stickers or

does the witness have exhibit stickers?

MR. HARRIS: The witness' are numbered.

Your Honor, if I might, just briefly with respect specifically to this exhibit, it does include sensitive information relevant to bank accounts and Social Security numbers, we feel it's important for the Court to have this information; we didn't want to submit it in redacted form, but the Government would request that it be accepted as an exhibit under seal or that we're given an opportunity to redact it before it's entered into the record.

THE COURT: I'll accept it under seal.

MR. HARRIS: Thank you.

THE COURT: I gather no objection, Mr. Willis?

MR. WILLIS: No, Your Honor.

THE COURT: You may proceed.

BY MR. HARRIS:

Q. So looking at these notes, Agent Strickland, can you just briefly walk the Court through what they contain?

A. These are handwritten notes that Mr. Reynolds identified as Mr. Thomas' handwriting. When I spoke with him over the phone when he met with our California agent, I asked him to decipher between what handwriting was Mr. Thomas' and what was Mr. Reynolds'. Mr. Reynolds circled his handwriting -- I'm sorry -- circled Mr. Reynolds' handwriting and initialed and dated where Mr. Reynolds had made notes.

The rest of the handwriting, which is primarily in all capitals and slanted, were identified as Mr. Thomas' handwriting.

These are -- it is a roadmap or a -- just a guide that Mr. Thomas provided to Mr. Reynolds on his -- regarding his assets that he held outside with various entities. And they contain, as you mentioned, sensitive information; personal identifiable information, addresses, passwords, log-on information, other like contacts at some of these entities.

Q. What was Mr. Reynolds supposed to do with all of this information that Mr. Thomas had provided to him?

A. Mr. Thomas offered Mr. Reynolds money. Essentially -- initially offered Mr. Reynolds all of the amount in the Wells Fargo account, which was approximately $21,386, if he could contact these entities under the guise of Mr. Thomas or his aliases and to determine how much was in these accounts and then also withdraw them into accounts that Mr. Reynolds controlled. And then -- in speaking with Mr. Reynolds, it was not just the 21,000 that he was offered. Mr. Reynolds understood his agreement with Mr. Thomas that he would also receive a certain percentage, approximately 25 percent of the, I guess, assets in these accounts. And Mr. Reynolds thought or had somehow calculated that he was potentially going to receive if he was successful in withdrawing these funds somewhere around $850,000.

Q.   Okay.  I want to ask specifically about the bitcoin.  What instructions was Mr. Reynolds given, whether in writing or orally, about what he was supposed to do with the bitcoin assets?

THE COURT:  Instructions that Mr. Thomas gave him?

MR. HARRIS:  Yes.

THE COURT:  You're asking in a passive voice, so just make sure I know who the actor is.

BY MR. HARRIS:

Q.   What instructions did Mr. Thomas give Mr. Reynolds with respect to the bitcoin?

A.   Bitcoin is an e-currency; it's a virtual currency.  It is not held by anyone, it's out on the worldwide web.  So there is an entity that Mr. Thomas set up his bitcoin at -- named coinbase.com and they are a platform in which you can facilitate or transfer, transact in virtual currencies.  And in order to get into Mr. Thomas' Coinbase account, he provided Mr. Reynolds a log-on as well as one or two passwords to access that account.

Q.   Did he give him any -- did Mr. Thomas give Mr. Reynolds any instructions about what to do with the bitcoin if he was able to obtain access to the Coinbase account?

A.   It was -- if he were to actually get into the Coinbase account, extract those funds, then he was to get in contact with another individual who knew about wallet.com or

walletexplorer.com -- I can't remember which it is -- and send it -- send some of these bitcoins, 5 or 10 at a time, through what is called, quote, unquote, "a mixer," which is -- a mixer, as I understand it, is a computer program which will -- it doesn't devalue the value of the bitcoin, but it essentially hides where that bitcoin originated from.

Q. And it was at least Mr. Reynolds' understanding, from the instructions he received from Mr. Thomas, that the point of that process was to make the bitcoin more difficult to trace; is that correct?

A. Yes.

Q. Do you know who he was supposed to contact with respect to the mixer or sending the bitcoins through the mixer?

THE COURT: That Mr. Reynolds was supposed to contact?

BY MR. HARRIS:

Q. That Mr. Reynolds was supposed to contact.

A. It was an individual -- a male individual in Mexico. Mr. Reynolds thought his name was Eric. However, in looking at other -- in reviewing other phone calls from Harnett County Detention Center, we noticed that Mr. Thomas was trying to reach out to a Jesus in Mexico. So kind of put the two together that possibly Jesus may have been the person since they were both in Mexico.

Q. So after receiving all of these instructions, did

Mr. Reynolds attempt to access all of these different accounts?

A.   He attempted to, for all three, save Wells Fargo.  He did not attempt to get into Wells Fargo because he said he took some time and thought about it and just thought, you know, calling up Wells Fargo without -- he just didn't think it was going to work, so he didn't even bother with Wells Fargo.

Q.   Did he attempt to access the bitcoin?

A.   He did.

Q.   And what did he do?

A.   He went online, he used the user name and password that Mr. Thomas provided.  Now, the -- there is a secondary, I guess what you call a challenge question or credentialing that is subsequently sent electronically to the holder of the account and that was -- that subsequent credential was sent to Mr. Thomas' cell phone that he had on account there, which Mr. Reynolds did not have.  So Mr. Reynolds used Mr. Thomas' e-mail account to sort of loop around that to gain access.  He was able to get a little bit further into the account; however, then he came across where Coinbase required a video Skype-type conference; and at that point, he shut it down because he knew that he did not look like Mr. Thomas.

Q.   So ultimately, Mr. Reynolds was not able to move any of the bitcoin through a mixer or otherwise transfer it from Coinbase?

A.   No.

Q. What did Mr. Reynolds do with respect to attempts to access PayPal?

A. He called PayPal -- excuse me. Mr. Reynolds called PayPal on the phone and used the name and the password that he had. However, the e-mail that Mr. -- that Mr. Reynolds had in relation to that account did not work. So in conversing with PayPal representatives, somehow the PayPal representatives provided him the actual e-mail that was related to that account. PayPal was under the name of one of Mr. Thomas' aliases, Griffin Mill, so Mr. Reynolds contacted them as if he was Griffin Mill.

Q. But was he ultimately able to move the money out of that account?

A. No.

Q. Okay. With respect to Proper Title, other than the e-mails that we've already discussed, did he make any other efforts to contact Proper Title, other than the e-mails we've already looked at?

A. He -- Mr. Reynolds made contact with them initially via phone to gain an understanding of who he was to contact at Proper Title and what he would need to move the funds. He did that as Griffin Mill and they provided him certain names at Proper Title to converse with and get more information on how to withdraw the funds.

Q. Okay. And if you'll turn to the last page -- I'm sorry.

It's labeled Proper Title 1939 in Government's Exhibit 1.  It's about three from the end.

Do you see that at the top where it's from Gemini Research and Technology request bank to transfer funds.

A.   Yes.

Q.   That's dated September 24th, 2018?

A.   Yes.

Q.   And was this a document that Mr. Reynolds sent to Proper Title in an attempt to have funds wired out?

A.   It is.

Q.   Do you know how he obtained Mr. Thomas' signature?

A.   Mr. Reynolds told us that Mr. Thomas requested that Mr. Reynolds search online for signatures so that he could obtain a signature that wasn't traceable.

Q.   Just to clarify the timeline here.  These attempts by Mr. Reynolds were in September of 2018; is that right?

A.   Yes.

Q.   And the attempts to access funds by Mr. Papadopoulos that you spoke about earlier, what timeframe were those?

A.   That was in late February to April, 2019.

Q.   2019; is that right?

A.   Yes, sir.

Q.   Okay.  Turning to the bitcoin, how did you ultimately -- how did you first come to learn about the bitcoin and the existence of that account?

A.   There were transactions with Coinbase in the Wells Fargo account for Mayfair Analytics.  So during the regular investigation prior to the plea agreement, we knew about bitcoin and Coinbase.

Q.   Mr. Thomas has two different types of accounts with Coinbase; is that right?

A.   Yes.

Q.   And one account is what's called a My Wallet; is that right?

A.   Yes.  It's essentially a moniker for account.

Q.   And there's another kind of account called a multi-signature account; is that right?

A.   Yes.

Q.   What's different about a multi-signature account?

A.   Multi-signature requires multiple credentials, multiple passwords in order to enter.

Q.   How many bitcoins total are in these two accounts?

A.   There are better than 17 in the My Wallet and just a little over 261 in the Multiple-signature Wallet, so 279 in total.

Q.   Does Mr. Thomas have any other assets associated with Coinbase other than just bitcoin?

A.   Well, bitcoin experienced what's called a fork, which is similar to a stock split.  So anyone who owned bitcoin in August of 2017 also received the same amount in bitcoin cash,

which is another e-currency.  So Mr. Thomas having a bitcoin received 279 bitcoin cash currencies.

Q.   And e-currency is an asset that can fluctuate in value; is that right?

A.   Yes.

Q.   Do you know approximately what the market value of the bitcoin and the bitcoin cash in Mr. Thomas' Coinbase accounts are as of today?

A.   As of today, the total figure is just at $3 million.

Q.   What is the current status of that bitcoin?

A.   The bitcoin is still with -- well, it's on the -- it's out there on the worldwide web.  The Government, pursuant to a warrant, sought to restrain those, restrained those in February.

Q.   And the Court has issued a restraining order; is that right?

A.   Yes, sir.

Q.   Does the Government currently have the necessary credentials to access those bitcoins?

A.   We've obtained credentials through Mr. Reynolds, these notes that Mr. Reynolds received from Mr. Thomas.  We also in the course leading up to the sentencing went back and rereviewed Mr. Thomas' computer and other data; and with the assistance of other investigators, found other credentials that may help us get access when it's approved.

Q.   Okay.  And after you discovered those credentials, did -- that was after the restraining order had been entered, is that correct?

A.   Yes.

Q.   And did the Government seek Mr. Thomas' consent to attempt to access the funds at that point?

A.   Yes.

Q.   Did Mr. Thomas refuse to consent?

A.   Yes.

Q.   So those bitcoins remain restrained, but they are still at Coinbase and on the bitcoin's public registry; is that right?

A.   Yes.

Q.   Touching very briefly on PayPal.  You've indicated you learned about that account from Mr. Reynolds; is that right?

A.   Yes.

Q.   How much is in that account?

A.   $74,393.

Q.   Okay.  And what's currently the status of the funds at PayPal?

A.   We are in the process of seeking to seize that pursuant to a warrant.

Q.   But that seizure hasn't been fully effectuated yet; is that right?

A.   No, sir.

MR. HARRIS:  One moment, Your Honor.

THE COURT: Okay.

BY MR. HARRIS:

Q. Now, you indicated earlier you reviewed the draft PSR in this case. Are you aware whether Mr. Thomas disclosed the existence of the Proper Title funds to the Probation Office?

A. I don't believe he did.

Q. What about the bitcoin?

A. No.

Q. What about the PayPal account?

A. No.

MR. HARRIS: That's all the questions I have, Your Honor.

THE COURT: Okay. Cross-examination.

MR. WILLIS: Thank you, Your Honor.

## CROSS-EXAMINATION

BY MR. WILLIS:

Q. Good afternoon, Mr. Strickland.

A. Good afternoon.

Q. I want to focus your attention to your interview of Alex Papadopoulos.

A. Yes, sir.

Q. You had an opportunity to review your memorandum of contact before testifying today?

A. Yes, sir.

Q. In direct examination you were asked a question of what

Mr. Papadopoulos was instructed to do by Mr. Thomas; do you recall that?

A.   Yes, sir.

Q.   And I understand from your answer that part of it was to ascertain the amount of funds in certain accounts; is that correct?

A.   Yes, yes.

Q.   And according to your memorandum of contact with Mr. Papadopoulos, Mr. Thomas never instructed Mr. Papadopoulos to actually do anything with regard to the funds in those accounts, did he?

A.   No.

Q.   So Mr. Thomas' alleged instructions to Mr. Papadopoulos was to ascertain balance information about certain accounts?

A.   Right.

Q.   And it was Mr. Papadopoulos' understanding that those accounts were company accounts; isn't that correct?

A.   Yes.

Q.   Mr. Thomas never referred to these accounts when discussing this with Mr. Papadopoulos as Mr. Thomas' accounts, correct?

A.   Well, Mr. Thomas owned the companies.

Q.   Let me ask you:  So the companies that Mr. Thomas referred to in talking to Mr. Papadopoulos, one of them was Gemini Analytics; is that correct?

A.    Yes.

Q.    And where is Gemini Analytics incorporated?

A.    I do not know, sir.

Q.    Who owns Gemini Analytics?

A.    I understand Mr. Thomas to own Gemini.

Q.    What documentation do you have that shows that Mr. Thomas owns Gemini Analytics?

A.    Gemini administration was incorporated in Nevis.  We obtained those from the proton e-mails, but we don't have any documentation on Gemini Signals, sir.

Q.    What proton e-mails did you determine --

A.    Those were e-mails that we obtained from when we were -- spoke with Nancy and Dean Walker.

Q.    How did you obtain those e-mails?

A.    We obtained them via consent.

Q.    So Nancy Walker gave you the passwords to those e-mail accounts, correct?

A.    Yes.

Q.    Those accounts are ProtonMail accounts; is that right?

A.    Yes, sir.

Q.    There was testimony on direct examination about ProtonMail account in this case as well, correct?

A.    Yes.

Q.    Mr. Reynolds was instructed to create a ProtonMail account; is that right?

A.    Yes.

Q.    I was confused by your testimony on direct when you talked about Mr. Reynolds' account.  You indicated you weren't able to ascertain information about that ProtonMail account that Mr. Reynolds set up; is that right?

A.    Well, we were describing Proton, the host company Proton, being that they are a -- the e-mails, whenever you have an e-mail at Proton is name or whatever type of name you want to bring up @protonmail.ch and the .ch is related to e-mails that are hosted out of Switzerland.

Mr. Reynolds developed a -- or created an e-mail account, a geminitech@protonmail.com.

Q.    So that e-mail account wasn't actually an e-mail hosted by ProtonMail in Switzerland?

A.    No, sir.

Q.    But Mr. Thomas used ProtonMail in Switzerland e-mail accounts, correct?

A.    Yes.

Q.    And it was those accounts or the passwords for those accounts that Nancy Walker provided you and other agents, correct?

A.    Yes, sir.

Q.    And you-all were able to access Mr. Thomas' ProtonMail accounts, correct?

A.    Yes, sir.

Q.   But then, in fact, you changed the passwords for those accounts; isn't that right?

A.   Well, we didn't change it.  They -- another layer of passwords was added to that.  So you have to enter in the initial passwords and then a subsequent password.

Q.   And what happened to that additional layer of passwords?

A.   They were lost.

Q.   And can those -- Mr. Thomas' ProtonMail e-mail accounts now be accessed?

A.   No, sir.

Q.   Okay.  And was Mr. Thomas ever provided the e-mails in the ProtonMail in Switzerland that you were able to review to establish that the Gemini corporation was incorporated in Nevis?

A.   Would you mind repeating that question?  I just want to follow.

Q.   Let's just cut right to the chase.  Those ProtonMail accounts that you reviewed, were they provided to defense in discovery?

A.   We weren't able to because they were...

Q.   Because the passwords or the second layer was lost, correct?

A.   Yes, sir.

Q.   Okay.  Are there other Gemini corporations related to Mr. Thomas, if you know?

A.   I know Gemini Administration and Gemini Research and the Gemini Signals.

Q.   Where is Gemini Research incorporated?

A.   I do not know, sir.

Q.   You don't know what kind of corporation it is?

A.   I know from talking with witnesses that had spoken with Mr. Thomas that Gemini, Gemini Research, Gemini Signals was an investment company that he owned, that he owned the intellectual property to, and he provided investment strategy that was based on an algorithm.

Q.   Are these witnesses you're mentioning, are they other jailhouse witnesses?

A.   That's where we obtained the information from, yes, sir.

Q.   But you don't actually know who owns Gemini Research?

A.   I don't have documentation on that, sir, no.

Q.   Or any of the other Gemini companies associated with this case?

A.   No, sir.

Q.   The Proper Title account that you've testified to, how did -- those funds in the Proper Title account, where did they come from?

A.   They originated from fees that were paid by clients to Gemini who wanted access to Gemini's investment strategies.  So they would pay a subscription fee, and those fees were paid -- initially, they -- well, essentially what they did is they

channeled through two separate lawyers; one being in Utah and another being in Florida, who agreed with Mr. Thomas to open a trust account for Gemini and Mr. Thomas and then hold them for a period of time and then after -- during that time, one of the attorneys was upset because he didn't think that Mr. Thomas was going to put in 700-some thousand dollars into that account so he requested that Mr. Thomas move those funds out. And then the other attorney who had received funds agreed to receive $300,000 and -- but subsequent to that, they noticed that the account had received additional funds of subscription fees in the amounts of like 3 or $9,000, and they said we do not agree to receive funds from other subscribers or from other clients; we agreed to hold for a period of time this $300,000.

So they then contact -- they wanted to get rid of those funds, so those two attorneys eventually sent them -- the money to Proper Title.

Q. So to be clear, the Gemini company, the clients who subscribe to this service, this is a trading-related service, a stock trading or some sort of --

A. It's an investment. Essentially, what the clients are paying for is a subscription for investment advice.

Q. And, again, just to clarify, this subscription service is separate and apart from the criminal activity that Mr. Thomas has pled guilty to, correct?

A. To our knowledge, yes.

B. Strickland - Cross-Examination

Q.   And the fees that were paid by the clients' fees paid to Gemini then end up ultimately in this Proper Title account; is that correct?

A.   Yes, sir.

Q.   You indicated that in talking to Mr. Reynolds he was ultimately unsuccessful in accessing any of these accounts; is that correct?

A.   Yes, sir.

Q.   And was he made any promises regarding prosecution by cooperating with your investigation?

A.   No, sir.

Q.   You didn't have concerns that he was involved in criminal activity in this case?

A.   I made no promises to him.  We made no promises to him.  I don't know if I fully understand your question, but we don't make promises to them, no.

We understood his background of going AWOL.

Q.   What about his attempts to access accounts that weren't his?

A.   We were investigating leads to find out what assets Mr. Thomas had; and in those leads, we came across Mr. Reynolds, so we engaged with him and his wife as witnesses.

Now, could Mr. Reynolds have accessed those accounts and taken the money?  Sure.  And that was one of the reasons that he felt this was a good deal between him and Mr. Thomas because

he would be in control.  He told us that Mr. Thomas had alluded to him that, you know, this is my life, these are all my accounts, you could really -- for lack of a better term -- screw me if you wanted to, if you gained access to these accounts.

Q.   Couple of follow-up questions on your answer.  First is, how was Mr. Thomas to communicate with Mr. Reynolds once Mr. Reynolds was released?

A.   Through phone calls.  I'm not exactly sure how he would.

Q.   In your interview with Mr. Reynolds, did he tell you that he did not provide Mr. Thomas' phone number?

A.   He did not provide his wife's phone number, and he did not provide -- I can't remember.  Maybe he didn't provide his own phone number, too.

Q.   All right.  So the theory being that Mr. Thomas provided all these passwords to these accounts to Mr. Reynolds, correct?

A.   Yes, sir.

Q.   That, in fact, Mr. Thomas handwrote a bunch of notes out for Mr. Reynolds, correct?

A.   Yes, sir.

Q.   Asked Mr. Reynolds to access these accounts, correct?

A.   Yes, sir.

Q.   Promised him hundreds of thousands of dollars, correct?

A.   Yes.

Q.   Mr. Reynolds was then released from the Harnett County

Jail; is that right?

A.   He was.

Q.   Mr. Thomas was still incarcerated in the Harnett County Jail, correct?

A.   Yes.

Q.   And when he was released, Mr. Reynolds was released, Mr. Thomas had no way to contact Mr. Reynolds; is that right?

A.   I would assume that he -- Mr. Reynolds could reach out to him in jail where Mr. Thomas was, but maybe --

Q.   My question was:  Did Mr. Thomas -- to your knowledge, Mr. Thomas had no way of contacting Mr. Reynolds?

A.   Not to my knowledge, sir.

Q.   Okay.  And this information that you testified to on direct examination about washing the bitcoin.

A.   Mixing.

Q.   I'm sorry.  Mixing the bitcoin.  I personally got confused.  You said that Travis Reynolds was told by Mr. Thomas to use wallet.com; is that correct?

A.   Walletexplorer.com.  It was based on the information that Mr. Reynolds provided to us, walletexplorer.com offers a way to mix these bitcoins, which gets rather technical, but basically hides the original address or source of where those bitcoins came from.

Q.   Who is Dan Curtain?

A.   Dan Curtain is an employee of coinbase.com.

Q.   When did you first get in contact with Dan Curtain?

A.   In April of 2017.

Q.   That was before Mr. Thomas signed the plea agreement, correct?

A.   Yes, sir.

Q.   Just to be clear, you reviewed that plea agreement; is that right?

A.   I had.

Q.   There's a forfeiture provision in that plea agreement, correct?

A.   Yes, sir.

Q.   Is any Coinbase or bitcoin, any of those assets identified in that forfeiture provision of the plea agreement?

A.   Not specifically, no, sir.

Q.   Isn't it true that Mr. Curtain at Coinbase described to you wallet.com in an e-mail exchange?

A.   I don't -- I don't recall.  I'd have to look back at my memo, sir.  I'm sorry.

Q.   You also mentioned that, I believe, Mr. Reynolds was told there was someone in Mexico that could manipulate the bitcoin; is that right?

A.   Yes, sir.

Q.   And that you reviewed Mr. Thomas' jailhouse phone calls to identify who that person was?

A.   Yes, sir.

B. Strickland - Cross-Examination

Q.   And there were attempted calls to someone named Jose?

A.   Jesus.

Q.   Jesus.  I'm sorry.

You don't know what those calls were about, do you?

A.   No, sir.

Q.   So that's just speculation on your part, correct?

A.   I put the two together because Mr. -- in speaking with Mr. Reynolds, he was trying to reach somebody, Mr. Thomas was trying -- Mr. Thomas told him to reach out to somebody -- or he had somebody in Mexico; and in reviewing phone calls from Harnett County, I noticed that Mr. Thomas was trying to reach somebody in Mexico.  However, they had two different names.

Q.   Okay.  So again, you're speculating about those phone calls that Mr. Thomas made to Mexico?

A.   Well, that's kind of what we do when we investigate, we try to follow the leads.

Q.   Well, there is facts and there is speculation, right?  You agree with that?

A.   Yes, sir.

Q.   My other follow-up question to this point about Mr. Reynolds was, you indicated that Mr. Thomas had engaged in an arrangement with the Walkers at some point earlier in the case; is that right?

A.   Yes, sir.

Q.   Nancy and Dean Walker, correct?

A.   Yes.

Q.   And Dean was somebody that Mr. Thomas met while in custody?

A.   At Orange County Detention Center in Virginia.

Q.   And Nancy is Dean's wife and out of custody, correct?

A.   Yes.

Q.   At some point Mr. Thomas gave Nancy ProtonMail passwords, correct?

A.   Yes.

Q.   And your understanding was to help Mr. Thomas manage this Gemini business; is that correct?

A.   It was, yes, to send e-mails on his behalf.

Q.   And did Mr. Thomas give the Walkers permission to use his funds to fund Dean's tree business?

A.   That's what -- that's what they alluded -- he said that the agreement was that they would access the e-mail for Mr. Thomas, send the e-mails and what information he wanted and then they would receive funds from Mr. --

Q.   Is this agreement in writing?

A.   No, sir.

Q.   In fact, the Walkers took a significant amount of money from Mr. Thomas, correct?

A.   $268,000, I would agree with that, yes, sir.

Q.   And that money is gone, correct?

A.   It is.

Q.   And that was without Mr. Thomas' authorization?

A.   I don't know that I agree with that, sir.  I think that he -- based on what they told us, they had an agreement.  How much money they were to take, give or take, I'm not sure.

MR. WILLIS:  May I have a moment, Your Honor?

THE COURT:  You may.

BY MR. WILLIS:

Q.   One last question about the Walkers.

A.   Yes, sir.

Q.   Do you recall Nancy Walker telling you that Dean Walker had made two unauthorized wire transfers or transactions of Mr. Thomas' funds?

A.   I remember the -- I don't remember the number, but I do recall that her -- her telling us that he did make one, or make one or two, yes.

MR. WILLIS:  Thank you.

Thank you, Your Honor.  Those are my questions.

THE COURT:  Mr. Harris?

MR. HARRIS:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. HARRIS:

Q.   Agent Strickland, you were asked a little bit about Gemini and your knowledge about the ownership structure of Gemini; is that right?

A.   Yes, sir.

Q.   And I believe you said you weren't sure exactly what the ownership structure of Gemini was; is that right?

A.   Yes.

Q.   But the funds at Proper Title, those were controlled, as far as you know, by Mr. Thomas, or at least he tried to access them through intermediaries; is that right?

A.   Yes.

Q.   And that was under the name of Gemini; is that right?

A.   Yes.

Q.   I'm going to ask briefly about this ProtonMail issue.  You were asked some questions about ProtonMail e-mail and passwords being changed; is that right?

A.   Yes.

Q.   Were some e-mails printed out prior to the passwords being changed?

A.   Yes.

Q.   And those -- were there quite a few e-mails that were printed out prior to the passwords being changed?

A.   Yes.

Q.   And were those generally the relevant e-mails to the case that were printed out?

A.   Yes.

Q.   And were the passwords, the extra layer that were changed, was that primarily related to threats of legal action by Mr. Thomas?

A.    Yes.

Q.    Specifically, do you recall the specifics of the threats?

A.    Just that an attorney had contacted Nancy Walker is really all I know about that.

Q.    And was there also concern about if Mr. Thomas was given access to all those e-mails that they might be deleted?

A.    Yes.

Q.    And then were those -- significant number of printed e-mails, were those, in fact, disclosed and produced to the defense?

A.    Yes.

Q.    So those printed e-mails that were disclosed and produced, they still exist currently, right?

A.    Yes.

Q.    It was just the remaining e-mails on the server that don't exist in real-time; is that right?

A.    Yes.

Q.    Now, you were also asked some questions about Mr. Reynolds and attempts or ability, I should say, of Mr. Thomas to contact him.

A.    Yes.

Q.    Are you aware, did Mr. Thomas ever attempt to reach Mr. Reynolds or his attorney while he was incarcerated at Harnett County after Mr. Reynolds was released?

A.    Mr. Thomas had contacted an attorney, a JAG officer, Judge

Advocate General, in an attempt to reach Mr. Reynolds.

Q.   Did he ask that officer for contact information for Mr. Reynolds?

A.   He did, but the JAG could not -- would not provide that to him.

MR. HARRIS:  I think that's all the questions I have.

THE COURT:  Anything else?

MR. WILLIS:  Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. WILLIS:

Q.   Did you interview this JAG officer?

A.   No, sir.

Q.   Who interviewed the JAG officer?

A.   To my knowledge, no one.

MR. WILLIS:  No further questions, Your Honor.

THE COURT:  Thank you.

Thank you, Agent.  Please watch your step.

Let's take a break until 4:05.

(The proceedings were recessed at 3:52 p.m. and reconvened at 4:06 p.m.)

THE COURT:  Mr. Harris, I want to be clear or have an understanding of something.  Let's look at page 2 of the plea agreement.  Do you have it with you?

MR. HARRIS:  I think I do, or we can find a copy, Your Honor.

THE COURT: Okay.

MR. HARRIS: Yes, Your Honor.

THE COURT: Let's go to Paragraph E. As I understand it, what you want to do, in part, by calling Mr. Thomas is to say that -- is to ask him about some things, and I understand from Mr. Willis he's going to assert his privilege. And if it's attempting to show that he hasn't signed any documents, why don't we just avoid the privilege issue, because the privilege would -- just because you plead guilty doesn't mean you sort of waive your privilege as to everything, right? So we all would agree on that; that that's the law.

And if what you're trying to show is pursuant to this provision in the plea agreement, we've given him this document to sign, this document to sign, this document to sign, you can do it through an agent and say, we gave him this document to sign on such a such a date, he refused or he didn't sign it or his lawyer told us he wouldn't sign it. And then we don't have any privilege issues to deal with and you get that evidence in to show me that you think that he's in violation of this provision in the plea agreement.

Am I missing something?

MR. HARRIS: Well, Your Honor, we're not really that concerned with evidence about him not signing anything. We've introduced evidence already that he hasn't completed a financial affidavit.

Our reason for this hearing, Your Honor, is based on some of the evidence that you just heard, you know, we are concerned that there are more assets that may be out there that we haven't -- that haven't been located at. And under 18 U.S.C. 3664, whether for forfeiture or restitution purposes and, specifically that provision refers to restitution, you know, this Court in advance of sentencing or at sentencing needs to determine what are his economic circumstances. So that's why we're interested in giving him an opportunity, since he hasn't submitted a financial --

THE COURT: Well, if the defense wants to call him, they can call him. The issue is when you want to call him in your case, you're sort of saying -- then we're sort of potentially injecting something into this case that we have some legal issues about it, and I've got cases I can cite to you, but there's a practical reality. I've got plenty of evidence right now that these assets -- that he controls these assets that I just heard about.

So I'm just trying to understand why it is you want to call him right now.

It's one thing if Mr. Willis wants to put him on; but I gather from what Mr. Willis has said, he's not going to put him on.

So it just wasn't clear to me, and still really isn't all that clear to me, why you want to call him, other than you

said sort of this charitable notion to give him a chance to explain himself and Mr. Willis says he doesn't want to explain himself. So where are we?

MR. HARRIS: Your Honor, not exactly to explain himself; but, again, for the Government to have the opportunity to ask him under oath what his assets are, because he has not submitted to the United States Attorney's Office a financial affidavit.

We understand he's met with Probation and there's information that has been provided into the PSR, but he has an obligation to do that and he hasn't done it.

And our view is in the context of self-incrimination, you know, if we go down the line and we're looking at him as a judgment debtor, or if a restitution order is entered, you know, the right to self-incrimination, this isn't a matter where he's being tried for crimes currently, so that privilege is relatively narrow.

Now, Mr. Willis has raised this argument that it applies and any questions about assets because he's already signed a document saying what his assets are in perjury, but he hasn't submitted that financial affidavit to the United States Attorney's Office, and that's why we want to ask him --

THE COURT: You said he submitted something to the Probation Office?

MR. HARRIS: That's our understanding based on what's

in the PSR.

And Your Honor, if Mr. Thomas is simply going to refuse to answer, you know, every question that I may pose to him and, you know, from a practical perspective your view is that would be a waste of time, then that's understandable. But that's the Government's position, that's why we have a hearing like this, is to ask him what are your economic circumstances because so far what we found through our independent investigation is we haven't gotten a straightforward answer.

THE COURT: Mr. Willis, why is it that Probation shouldn't hand over the document that he claims -- that the PSR says Probation says we got a document from your client? Do you have some issue associated with Probation turning that over to the U.S. Attorney's Office?

MR. WILLIS: No, Your Honor. I think that information he's provided is included in the first draft of the presentence report.

THE COURT: But you're saying you don't have that document?

MR. HARRIS: Well, I'm saying, Your Honor, that the information is included in the PSR, but if you want to order Probation to provide to us the signed written statement, then we're -- that would be fine.

Our --

THE COURT: Have you asked Probation for it and they

said, well, the Judge has to order me to do that?

MR. HARRIS: Essentially, Your Honor, yes. And we've, in fact, gotten information from Probation, but we want you to order it to make sure we can actually rely on it, you know, and make sure that everything is essentially done properly.

Again, the way it would normally work is that we would ask for a financial affidavit from the defendant to be provided to the United States Government separately than what's provided to the Court through the Probation Office and that hasn't been done.

So if that's the solution here and you order Probation to provide that to us and everything is covered, then the Government will be satisfied with that as well.

THE COURT: The Probation Office must have left. There was a probation officer here earlier.

All right. Well, I order the Probation Office to provide the document that Mr. Thomas provided to the Probation Office to the U.S. Attorney, and we'll make sure that Chief Corpening knows that I ordered that, and I expect that to be complied with promptly.

MR. HARRIS: Thank you, Your Honor.

Again, just to make sure that we're very clear. The Probation Office has provided this information to us, but we want to make sure that we have it; that it's done appropriately

and that we can rely on it.

THE COURT:  Right.  You want -- they've sort of summarized the information in a draft of the PSR, but you don't have the document and --

MR. HARRIS:  Well, no, Your Honor, that's why I want to be clear.  They provided a copy of an affidavit -- or a signed statement to us, but that's what we want to make sure that it is okay for the Government to actually rely on that statement in some fashion because it wasn't provided to the Government; it was provided to the Probation Office.

THE COURT:  Okay.  Well, in my view you can rely on it.  So you need to have it and you're going to get it, because I've ordered you to get it.

MR. HARRIS:  Thank you, Your Honor.

THE COURT:  But I'm not -- unless Mr. Willis wants to put Mr. Thomas on, we're just not going to go down the path of him being called.

Now, I've also heard enough -- I mean -- and I want to get some clarification from you as to just what it is that you want because in connection with, for example, access to certain account information, I mean, I credit what the -- what I've heard about what the agent testified to about Mr. Thomas' interactions with Mr. Reynolds and that Mr. Thomas wrote this, wrote all this account information.  I mean, are you also seeking an order to be able to get that, I mean, to access

those accounts?  That's what I read from your papers.

MR. HARRIS:  Yes, Your Honor.

Frankly, there is two things that we would prefer to be able to have:  Number one, we've submitted a preliminary order of forfeiture that is pending, and the Court's practice is usually to wait until, I think, sentencing to enter those. I would say, Your Honor, since we filed that initial motion for preliminary order of forfeiture, we discovered these additional -- some of the additional assets; that order included bitcoin.

So what we would like, we would like for the Government to promptly, probably tomorrow, file an amended motion for preliminary order of forfeiture that can be entered immediately to go ahead and forfeit all of these assets as substitute assets.

And number two what we would like -- and it was part of our original motion for preliminary order of forfeiture -- is for the Court to -- is for the Court essentially to order -- well, this problem will be solved, frankly, by the entering of the preliminary order of forfeiture.

We want to try to access the bitcoin.  When we got the credentials there was no order allowing us to do it, so we went to the defendant for consent and he refused.  You know, we're worried about that.

So upon entry of the preliminary order of forfeiture,

Your Honor, we'll be authorized to seize it. So I think if we file that amended motion and that order can get entered immediately, then that will solve the Government's problem.

THE COURT: Okay. Mr. Willis, do you want to be heard on those issues?

MR. WILLIS: Your Honor, I feel obligated to be heard. I appreciate this hearing is dealing with restitution under 3664 and my reading of the statute in the case law is the defendant has a burden to establish his financial ability to pay. We're not contesting, no issue with the restitution amount and we're not putting on any evidence about his financial condition to pay. I think the Court can order full restitution in this case.

It's a separate issue, Your Honor, about forfeiture, and part of what this hearing went to was ownership of these assets. The 3664 restitution statute contemplates assets that he either owns or controls. I think the substitute asset forfeiture provision is different. I think the Government would have to prove that these are, in fact, his assets, which is part of the reason I asked the questions about Gemini; that the defense takes the position that some of these accounts, including the bitcoin and Proper Title, are not the defendant's assets. They are assets of the corporation.

We haven't contested or discussed the Wells Fargo account. He's never made an attempt, I don't think there was

evidence, to actually try to access that, he disclosed that account to Probation as an asset, but these other accounts are corporate accounts; and, frankly, part of the issue -- and I know the Government has attempted to respond with Agent Strickland on redirect about this ProtonMail account -- part of what I understand in discussing this with Mr. Thomas is those e-mail accounts that are lost would potentially have documentation to establish Gemini ownership and who the shareholders are of those corporations, to establish what, if any, ownership Mr. Thomas may or may not have of proceeds --

THE COURT: But under a forfeiture provision -- let's say I order it to be forfeited -- anybody who claims to be an owner, they get to come in here and they get to tell me what they want to say and I get to decide. It's like, you know what, Mr. Smith, you actually are Gemini, you own Gemini and the Government doesn't get to get this of Gemini.

But if we go through sort of the preliminary forfeiture process, there's a notice process and people can come in and I'm very familiar with that process.

And so I appreciate your concern for potential innocent owners of Gemini or Gemini affiliates, and I'm going to look out for them if there are such things, such people or such entities and they'll have a full opportunity to be heard before any final order of forfeiture.

Do you get that?

MR. WILLIS: I do, Your Honor.

THE COURT: So, again, I appreciate your concern for those third parties who might not be here, who might not exist, who might exist, I don't know, but I know there's a process to deal with that, and I deal with it in forfeiture-issued cases all the time.

All right. Anything else?

I think it would be helpful, Mr. Harris, if you did get an amended preliminary order of forfeiture with an amended proposed order, and if you can get that to me by the end of the day tomorrow, I'll be here. I'll be here on the 3rd, doing a naturalization ceremony on the 4th. I won't be here on the 4th, I'll be in Kinston with a bunch of new citizens, which will be great.

But if you get it to me tomorrow I'll be able to review it promptly, and I think I have a pretty good handle on where we are. And the hearing was helpful.

And, again, I think you're right in terms of if I review it and the order, I sign it, I don't think there will be any issue with you-all getting the bitcoin materials and these other things. And then to the extent there is anybody who claims to be some kind of innocent owner, I'll hear from them at the appropriate time.

So does the Government want to tell me anything else today about this?

MR. HARRIS:  No, Your Honor.  I think you covered it. Thank you.

THE COURT:  Mr. Willis, anything else today from your perspective?

MR. WILLIS:  May I have a moment with my client?

THE COURT:  You may.

(Pause in the proceeding.)

MR. WILLIS:  No, Your Honor.  Thank you.

THE COURT:  I do thank counsel for their work here today, and I look forward to getting the amended motion for preliminary order of forfeiture with an amended proposed order.

We'll be in recess until 9:00 a.m. tomorrow.

*       *       *

(The proceedings concluded at 4:24 p.m.)

UNITED STATE DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Amy M. Condon, CRR, RPR, CSR, Federal Official Court Reporter, in and for the United States District Court for the Eastern District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 9th day of July, 2019.

/s/ Amy M. Condon
Amy M. Condon, CRR, CSR, RPR
U.S. Official Court Reporter