UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:16-CR-00298-D
NO. 5:18-CR-00087-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| TREYTON LEE THOMAS, | ) | |
|     fka Tracy Lee Thomas, | ) | |
|     aka Trayton Thomas, | ) | |
|     aka T.L. Thomas, | ) | |
|     aka Lee Thomas, | ) | |
|     aka Erick Stratton | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, respectfully files this memorandum to address the sentencing of Defendant Treyton Lee Thomas and to oppose his request for a downward variance. The Government recommends that the Court sentence the Defendant to the high end of the applicable United States Sentencing Guideline range, order him to pay restitution and the costs of prosecution, as calculated by the United States Probation Office, and forfeit $7,282,524. For the reasons stated below, this sentence is sufficient, but not greater than necessary, to achieve the goals of 18 U.S.C. Section 3553(a), in that it will reflect the seriousness of the offenses, promote respect for the law, provide just punishment for the offenses, deter future crime, and protect the public from further crimes of the Defendant.

I.     **The Offense Conduct**

The Presentence Investigation Report accurately sets forth a detailed, lengthy summary of the conduct charged in both Indictments.  See 5:16-CR-00298-D, D.E. 122 and 5:18-CR-00087-D, D.E. 36 (hereinafter referred to as "PSR").  In a nutshell, beginning in January 2005 and continuing to August 2013, the Defendant engineered and carried out an elaborate investment fraud scheme, falsely representing to his father, his father's business associates, his wife, and his father-in-law (collectively referred to as "the victims") that he invested their money in secured United States Treasury Bills.  Instead, he made highly risky investments in the commodity markets, resulting in significant losses.  The Defendant also used some of the stolen money to fund his lavish lifestyle, in Naples, Florida, where he lived in an oceanfront condominium and belonged to an exclusive golf and yacht club.  Despite the losses, the Defendant concealed the fraudulent scheme for more than seven years by repeatedly lying to investors, business executives, bankers, brokers, and accountants and providing these individuals with fabricated brokerage and bank documents.

In desperate need of more funds to conceal the losses and to maintain his extravagant standard of living, the Defendant mortgaged his father's real estate holdings.  Well aware that his father's net worth had plummeted due to the Defendant's thievery, the Defendant dishonestly represented to the lenders that his father had millions securely invested.  Like all Ponzi schemes, the Defendant eventually began using other investors' money to conceal his fraud and meet pressing financial obligations to include his father's mortgages and quarterly payments to his

2

wife and father-in-law, who wrongly believed these funds represented interest earned on their investments.

Ultimately, in 2012, Fidelity Bank and Trust (Fidelity) discovered the fraud and alerted the United States Secret Service. Hired to act as trustee over the victims' funds, Fidelity lacked physical control over the investors' funds, but monitored the value with brokerage statements provided by the Defendant. When dealing with an expert fraudster, like the Defendant, this shadow accounting method proved ineffective.[1]

During the course of the grand jury investigation, the Government learned that the Defendant had failed to file United States Income Tax Returns (Forms 1040) or pay taxes for two decades. To conceal his income, the Defendant used offshore entities, in the Cayman Islands, the British Virgin Islands and Nevis, and employed individuals from offshore corporation management companies to act as his nominee in numerous business ventures. PSR at ¶70. These foreigners opened and managed bank accounts through which the Defendant moved the victims' funds in and out of the United States. Id. at ¶71. Additionally, the Defendant created fake or "ghost" employees to make it appear that he operated a large, successful investment fund.

---

[1] The PSR has not allocated any restitution to Fidelity even though the financial institution financially suffered from the Defendant's fraud. See PSR at ¶87. Finding himself insolvent after learning his son had defrauded him, the Defendant's father was forced into bankruptcy. See United States Bankruptcy Court for the Middle District of North Carolina Case 1:15-BK-80016. The bankruptcy trustee, on behalf of the debtor, filed a complaint against Fidelity on August 3, 2015, asserting various contract and tort claims. See United States Bankruptcy Court for the Middle District of North Carolina Case 1:15-BK-09032 at D.E.1. Fidelity has expended considerable resources to defend itself and, on June 6, 2019, entered into a settlement with the trustee, agreeing to pay $1,062,500. Id. at 234 and 239.

3

To conceal his own identity, he used aliases or variations of his given name. Id. at ¶¶ 73-74; 5:16-CR-00298-D, D.E. 77 at 18-25.

In addition to the illegal income the Defendant earned income through his fraudulent schemes, the Defendant sold subscriptions to trading algorithms. PSR at ¶¶ 69, 75. Although he was the mastermind and spent his days formulating these highly complex trading tools, the Defendant's name was never associated with the algorithms. The Defendant partnered with two different individuals who marketed and managed the sale of the algorithms under their business names: Markman Capital Insight (MCI) and Pro Trading. Id. at ¶ 75. He attempted to conceal his identity from the owner of Pro Trading by communicating through his alias, Eric Stratton.[2] Id. at ¶ 76 "[The Defendant] alluded that he was a secret agent of sorts, and it was paramount that [the owner of Pro Trading] keep their relationship secret." Id. These individuals were initially unaware that the Defendant was simultaneously providing his algorithms to both of them. Id. at ¶ 77. Once he learned he was under investigation, the Defendant became more secretive and attempted to influence the answers the owner of Pro-Trading provided to investigators. Id. The Defendant spoke in code when he referred to various investigatory agencies, including the Department of Justice and the Internal Revenue Service.[3] Id. The Defendant

---

[2] Eric Stratton was a character in the 1978 National Lampoon comedy, Animal House. In the July 1, 2019 hearing, the Court heard that the Defendant used another alias, Griffin Mills, to hide his ownership of financial accounts and his association with his sale of algorithms through Gemini. Griffin Mills was similarly a movie character, played by Tim Robbins, in the 1992 satirical hit, The Player.

[3] On March 22, 2016, the Commodities Futures and Trading Commission (CFTC), an independent federal regulatory agency responsible for detecting fraud in the commodity futures market, filed a civil action against the Defendant, in the United District Court for the Middle District of North Carolina. See 1:16-CV-00226, D.E. 1. The Defendant refused to accept service of process. See 5:16-CR-00298-

suggested to the owner of Pro Trading "how to answer" any investigatory questions. Id.

　　To conceal the income he earned from MCI and Pro Trading, the Defendant instructed these businesses to wire his fees to the Cayman National Bank (CNB). Id. at ¶ 75. On one occasion, MCI followed the Defendant's request and forwarded a large income payment to a Rocky Mount, North Carolina attorney's trust account. Id. The Defendant told MCI that the attorney oversaw the Defendant's charitable work with The Boys and Girls Club. Id. This was a lie. The attorney represented one of the fraud victims. The payment was partial settlement of a lawsuit this victim filed to obtain the monies the Defendant had fraudulently obtained. Id.; see also Southern Warranty v. NC&VA, Nash County 12 CVS 711. After the Defendant learned of the criminal investigation, and the Government's discovery of the Cayman National Bank accounts, the Defendant instructed MCI to wire his payments to a domestic bank account, in the name of a newly formed entity, Mayfair Analytics. The Defendant took out cash, which he gave to his wife to pay their personal expenses. PSR at ¶78. In 2014 and 2015, the Defendant began using Bitcoin, a virtual currency, enabling him to complete transactions without detection. Additionally, he parked earnings in third party trust accounts maintained by attorneys and property title companies and Pay Pal, an online money processor.

---

D, D.E. 77 at 33-34 (Agent Strickland testified that the Defendant told his wife to lie and "attempted to physically and verbally keep her from answering th[e] door" for an Albemarle County deputy Sheriff engaged by the CFTC to serve the Defendant with the Complaint. On April 11, 2017, United States District Judge Loretta C. Biggs entered a default judgment, ordering the Defendant to pay $3,331,239. 1:16-CV-00226, D.E. 20 at ¶ 31.

For the tax years 2006 through and including 2015, the Defendant earned approximately $2,146,028. By failing to file income tax returns and affirmatively acting to conceal his income from the IRS, he successfully evaded approximately $1,292,806 in income tax due and owing to the United States Treasury.[4]

## II.     **The Plea Agreement and the Appropriate Guidelines Calculation**

On October 2, 2018, pursuant to a written plea agreement, the Defendant pled guilty to Count Six of the 2016 Indictment (Wire Fraud) and Count Two of the 2018 Indictment (Tax Evasion). (5:16-CR-00298-D, D.E. 95 and 5:18-CR-00087-D, D.E. 19). The Government agreed, at the time of sentencing, to dismiss Counts One through Five and Seven through Twenty-One of the Indictment in 5:16-CR-298-D and Counts One and Three through Eight of the Indictment in 5:18-CR-87-D. Id. at ¶4a. The parties agreed to numerous sentencing factors with respect to the Guidelines calculation. See Id. at ¶5; PSR at ¶8. Based upon these stipulations, the parties agree to the following Guideline adjustments for Wire Fraud and Tax Evasion:

---

[4] The following is a yearly breakdown of taxable income and taxes due and owing:

| Tax Year | Taxable Income | Tax Due |
|---|---|---|
| 2006 | $388,510 | $122,604 |
| 2007 | $435,872 | $138,658 |
| 2008 | $325,420 | $ 99,685 |
| 2009 | $267,018 | $ 78,637 |
| 2010 | $292,131 | $100,848 |
| 2011 | $678,445 | $246,411 |
| 2012 | $463,484 | $164,649 |
| 2013 | $247,872 | $ 94,022 |
| 2014 | $439,710 | $176,783 |
| 2015 | $188,347 | $ 70,509 |
| **Total** | **$2,146,028** | **$1,292,806** |

See IRS Government Forms 4549-A (attached as Exhibit 1). As the Probation Officer noted, "due to a lack of documentation, the IRS was unable to ascertain the amount unpaid federal tax between 1999 and 2005. PSR at note 7.

6

Wire Fraud

| | |
|---|---|
| Base Offense Level (§2B1.1(a)(1)) | 7 |
| Loss between $3.5 and $9.5 million (§2B1.1(b)(1)(J)) | +18 |
| Offense resulted in substantial hardship (§2B1.1(b)(2)(A)(iii)) | + 2 |
| Sophisticated Means (§2B1.1(b)(10)(C)) | + 2 |
| More than $1 million from Financial Institution (§2B1.1(b)(17)(A)) | + 2 |
| Abuse Position of Trust (§3B1.3) | + 2 |
| Role in the Offense (§3B1.1(c)) | + 2 |
| **Adjusted Offense Level** | **35** |

| | |
|---|---|
| Tax Fraud | |
| Base Offense Level (§§ 2T1.1(a)(1) 2T4.1(H)) | 20 |
| Source of income from criminal activity (§2T1.1(b)(1)) | + 2 |
| Sophisticated Means (§2T1.1(b)(2)) | + 2 |
| Role in the Offense (§3B1.1(b)) | + 2 |
| **Adjusted Offense Level** | **26** |

Since the Wire Fraud adjusted offense level is nine-levels greater than the Tax Fraud adjusted offense level, the combined adjusted offense level is 37. <u>See</u> USSG Section 3D1.4(c).

A. **Obstruction of Justice**

The Probation Office correctly imposed a two-level enhancement for obstruction of justice, pursuant to USSG Section 3C1.1, based upon threats the Defendant made against the lead prosecutor. PSR at ¶¶ 81-84, 117 and 127. The Probation Office concluded the Defendant paid an individual $500 to place a "hex" on her, offered to pay a fellow inmate $10,000 to harm her and attempted to call an undercover federal agent who the Defendant believed could get rid of her for a fee.

For the enhancement to apply, the Government must show, by a preponderance of the evidence, that the Defendant willfully obstructed or attempted to obstruct or impeded the administration of justice. <u>United States v. Kiulin</u>, 360 F.3d 456, 460 (4th Cir. 2004). The language of the enhancement is broad and the

7

commentary recognizes that "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness." USSG § 3C1.1. cmt. n.3. The enhancement has been consistently applied where defendants have threatened prosecutors and other court personnel. See United States v. Addison, 683 Fed. App'x. 921 (11th Cir.) (unpublished) (threatened to kill the prosecutor), cert. denied, 138 S. Ct. 414 (2017); United States v. Jordan, 428 Fed. App'x. 812 (10th Cir. 2011) (unpublished) (threatened to seize prosecutor's property); United States v. Thach, 411 Fed. App'x. 485 (3rd Cir.) (unpublished) (filed false liens against the judge and prosecutor), cert. denied, 562 U.S. 1249 (2011); United States v. Jackson, 381 Fed. App'x. 298 (4th Cir. 2010) (unpublished) (threatened to kill state police officer); United States v. Whalstrom, 588 F.3d 538 (8th Cir. 2009) (threatened to murder prosecutor's wife); United States v. Dehghani, 550 F.3d 716 (8th Cir. 2008) (threatened trial judge); United States v. Goldberg, 937 F. Supp. 1121 (M.D. Pa. 2009) (threatened life of defense attorney), aff'd, 133 F.3d 911 (3rd Cir. 1997).

The Tenth Circuit affirmed the application of the obstruction enhancement in in nearly identical circumstances to those found here. In United States v. Black, the defendant offered his cellmate $50,000 to kill the prosecutor assigned to the defendant's case. 168 Fed. App'x. 272 (10th Cir. 2006) (unpublished). Regardless of Black's intent or likelihood of success in executing his obstructive plan, the district judge concluded his threats could have an impact on the administration: "if participants are fearful for their well-being and wish to minimize that fear, it impacts a fair result." Id. at 274. Likewise, in United States v. Whalstrom, the sentencing

judge characterized threats against prosecutor's wife as "an attempt to terrorize an officer of the Court" to influence that prosecutor's actions. 588 F.3d at 545; see also United States v. Dehghani, 550 F.3d at 722 (an empty threat against a judge represented an attempt to manipulate the criminal justice system by potentially forcing the replacement of the threatened judge).

The Court should similarly conclude that the Defendant's obstructive actions in this case strike at the very heart of the criminal justice system. When a defendant threatens court personnel, it is usually to affect charging decisions and the outcome of the case, either at trial or at sentencing. Moreover, law enforcement resources, which could be better used to investigate and prosecute other cases, must be tapped to investigate and mitigate any potential threat.

This is exactly what happened here. Deputy Marshal Mason testified at the detention hearing that the Government took the Defendant's threats seriously and expended significant resources to ensure the safety of both prosecutors. Specifically, the United States Marshal Service (USMS) conducted a full threat assessment of their homes, instructed the lead prosecutor to take additional safety precautions and requested the local police department regularly monitor the lead prosecutor's home in marked vehicles. Based upon USMS's threat assessment, the Department of Justice paid to upgrade the lead prosecutor's home security system. To further minimize the threat, USMS moved the Defendant to another detention facility where jail employees spent additional time, heavily scrutinizing the Defendant's activities.

9

Accordingly, the Government has met its burden. The Court should add two-levels to the Defendant's offense level.

The Defendant objects to the enhancement on two grounds. (D.E. 111; PSR at 31-33). First, the Defendant argues, without legal support, that the Government is precluded from advocating for the enhancement. By agreeing to a downward adjustment for acceptance of responsibility, the Defendant claims the Government "essentially stipulated away" the obstruction enhancement. D.E. 111 at 2 (*citing* USSG Section 3E1.1, cmt. n.4) (limiting the simultaneous application of both adjustments to "extraordinary cases."). If the Government pursues the enhancement, the Defendant implies the Government will be in breach. He is wrong.

By remaining silent on this issue, the Government did not forfeit any rights, nor will it be in breach by advocating for this enhancement. As the Defendant points out, the Guidelines leave open the possibility of an "extraordinary case" where a defendant who has obstructed justice may also receive a reduction for acceptance of responsibility. See USSG Section 3E1.1, cmt. n.4. The Fourth Circuit recently recognized that "some types of conduct justifying an obstruction enhancement might not be incompatible with acceptance of responsibility." United States v. Harris, 890 F.3d 480, 488 (4th Cir. 2018) (*citing* United States v. Hopper, 27 F.3d 378, 383 (9th Cir. 1994). For instance, a defendant who escapes custody, but immediately turns himself over to authorities or an exceptionally cooperative defendant who readily confesses and offers evidence of guilt, according to the Fourth Circuit, merit an acceptance reduction. Id. (citations omitted). The Defendant's obstructive conduct

described in the PSR occurred before the Defendant eventually accepted responsibility for his crimes by pleading guilty. Therefore, during plea negotiations, the Government could have sincerely believed the Defendant was entitled to an acceptance of responsibility reduction even though he had earlier attempted to obstruct justice.

The Defendant's second objection is a factual basis one. PSR at 32. He challenges the credibility of one source (i.e. an unsolicited jailhouse informant) and "the implausibility," given his educational background and sophistication," that he would pay someone to place a "hex" on the lead prosecutor. Id. In his response, Probation Officer Cole pointed out the evidence included additional inmates who the Defendant solicited for assistance. Id. at 33. Indeed, Probation Officer Cole relied upon more than the evidence presented at the detention hearing. He reviewed the actual witness statements, provided to the Defendant in discovery. Edgar Rivera had absolutely nothing to gain when he notified the authorities of the Defendant's intentions. He was serving a state sentence for driving violations. He was not a hardened criminal, hoping to receive a benefit from the federal government for "snitching." Nancy Walker and Dean Walker gave their statements while represented by counsel and pursuant to proffer agreements. As such, they had no reason to lie and every incentive to tell the truth. There was also corroborative evidence, including recorded telephone calls, email correspondence and documents. Additionally, unknown to Probation Officer Cole at the time he completed the PSR, the Defendant was scheming with other inmates to obstruct justice. Accordingly, the

Court can conclude there is a sufficient factual basis to find, by a preponderance of the evidence, that the Defendant made these threats against the lead prosecutor in an attempt to obstruct the due administration of justice.

In addition to the threats, there are at least two other grounds to find the Defendant willfully attempted to obstruct justice. First, based upon the evidence presented at the July 1, 2019 hearing, the Court should also find that the Defendant lied in a sworn financial statement provided to Probation Officer Cole. The commentary to the obstruction of justice provision specifically provides that the enhancement should apply if the Defendant "provid[es] materially false information to a probation officer in respect to a presentence or other investigation for the court" USSG § 3C1.1, cmt. n.4. The Defendant did not disclose the Bitcoin, Proper Title and Pay Pal accounts. See Exhibit 2 at 3. Nor did the Defendant disclose his business ownership or affiliation with Gemini Research, an entity name through which he earned income selling trading algorithms. Id. at 5. This information was material to the preparation of the PSR for purposes of determining the Defendant's ability to pay restitution and fines. See USSG Section 3C1.1 cmt. n.6 (defining material evidence as "if believed, would tend to influence or affect the issue under determination.").

Courts have specifically held that providing a false financial statement to the Probation Officer preparing the PSR is grounds for applying the obstruction of justice enhancement. See United States v. Manojlovic, 520 Fed. App'x. 449 (7th Cir. 2013) (unpublished); United States v. Miller, 607 F.3d 144 (5th Cir. 2010); United States v. Jones, 332 Fed. App'x. 801 (3rd Cir. 2009) (unpublished), cert. denied, 559 U.S. 1020

(2010). Likewise, courts have applied the enhancement where defendants provided false financial information to the Probation Office to obtain court-appointed counsel. See United States v. Iverson, 874 F.3d 855 (5th Cir. 2017), cert. denied, __ U.S. __, 138 S. Ct. 1180 (2018); United States v. Brantley, 596 Fed. App'x. 780 (11th Cir. 2015) (unpublished); United States v. Westmoreland, 72 Fed. App'x. 29 (4th Cir. 2003) (unpublished). Under both circumstances, the defendants attempted to impede the due administration of justice by presenting false information to judicial officers charged with making factually supported legal rulings.

Second, the Court should consider the Defendant's attempts to move forfeitable assets, which should have been available to meet his substantial restitution and forfeiture obligations. See United States v. Popov, 555 Fed. App'x. 671 (9th Cir. 2014) (unpublished) (defendant directed son to hide assets from the government); United States v. Dufresne, 698 F.3d 663 (8th Cir. 2012) (defendant used third parties to dispose substitute assets).

The evidence presented at the July 1, 2019 hearing and in the Government's most recent motion to relieve it of its obligations under the plea agreement provide the Court with sufficient factual support to find, by a preponderance of the evidence, that the Defendant intentionally schemed to prevent the Government from gaining control over such assets. His use of third parties to transfer assets into their names coupled with his use of code names for some of the assets demonstrates he knew he was acting unlawfully and intended to obstruct. If he had succeeded, the Court's restitution and forfeiture orders would have been, practically speaking,

13

unenforceable.  Aware of the Court's legal obligations to order restitution, the Defendant's actions "amounted to 'thumbing [his] nose at the victims in this case." United States v. Jefferson, 621 Fed. App'x. 757, 760 (4th Cir. 2015) (unpublished), cert. denied, __ U.S. ___, 136 S. Ct. 844 (2016).

Therefore, for the three grounds stated, the Court should find that the Defendant willfully sought to frustrate the due administration of justice and impose a two-level upward adjustment, increasing his total offense level to 37.

### B.    Acceptance of Responsibility

The Government has requested the Court to find the Defendant breached the plea agreement by:

> failing to disclose his assets to the Government on a sworn financial affidavit, refusing to consent to Government access of his Bitcoin accounts and scheming to thwart the Government's ability to secure financial compensation for the victims of his fraudulent schemes and to collect all forfeitable assets.

5:16-CR-00298-D, D.E. 135 and 5:18-CR-00087-D, D.E. 44.  If the Court agrees the Defendant failed to keep his part of the bargain, the Government should be free to argue against any downward adjustment for acceptance of responsibility.

Section 3E1.1(a) provides "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."  USSG Section 3E1.1(a).  "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right."  USSG Section 3E1.1 cmt. n.3.  The guilty plea "may be outweighed by conduct that is inconsistent with such acceptance of responsibility."  Id.  The Defendant has the burden of proving acceptance of

14

responsibility by a preponderance of the evidence. United States v. May, 359 F.3d 683, 693 (4th Cir. 2004). "The sentencing judge must weigh the totality of the circumstances" in determining whether the Defendant has truly accepted responsibility for his crimes. United States v. Harris, 890 F.3d at 488. In light of the Defendant's conduct here, the Commentary suggests considering whether the Defendant has made a "voluntary payment of restitution prior to adjudication of guilt" and provided "voluntarily assistance to authorities in the recovery of the fruits and instrumentalities of the offense." USSG Section 3E1.1 cmt. n.1(C) and (E).

The Defendant did not voluntarily pay restitution. Instead, he took steps to conceal his assets. Further, he refused to assist the Government in the recovery of the Bitcoin accounts. By disregarding his restitution and forfeiture obligations, the Defendant is not entitled to the reduction. See United States v. Watson, 390 F.3d 577 (8th Cir. 2004) (defendant not entitled to acceptance where she refused to account for the stolen funds), judgment vacated on other grounds, 544 U.S. 971 (2005); United States v. Baker, 94 Fed. App'x. 118 (3rd Cir. 2004) (unpublished) (defendant not entitled to acceptance where she dissipated assets by purchasing two automobiles and forfeited "fake jewelry"); United States v. Lim, 235 F.3d 382 (8th Cir. 2000) (defendant not entitled to acceptance where he refused to assist in the recovery of forfeitable assets); United States v. Zichettello, 208 F.3d 72 (2nd Cir. 2000) (defendant not entitled to acceptance where he failed to make restitution payment when he had available funds), cert. denied, 531 U.S. 1143 (2001).

The Defendant's refusal to disclose his assets in a financial affidavit or supply the credentials to the Bitcoin accounts resulted in the Government expending significant resources. Federal agents, in five States, spent more than 200 hours gathering evidence and interviewing witnesses. The Government had to seek court intervention to secure assets that he had promised to disclose and forfeit. Judicial officers spent time reviewing and granting seizure warrants and restraining orders; none of which would have been required if the Defendant honored his obligations.

As the Defendant acknowledges, the Guidelines suggest that a defendant's conduct resulting in an obstruction of justice enhancement "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. USSG Section 3E1.1 cmt. n.4. To merit a reduction, the Defendant bears the burden of showing that his circumstances are extraordinary. United States v. Hudson, 272 F.3d 260, 264 (4th Cir. 2001), aff'd, 75 Fed. App'x. 182 (4th Cir. 2003) (unpublished). Based on the records before the Court, the Defendant had not met his burden.

With a Criminal History Category I and an offense level 37, the Guideline range is 210 to 262 months' imprisonment and a fine between $40,000 and $400,000.

## III.    **The § 3553(a) Factors, Applied and the Appropriate Sentence**

Following United States v. Booker, 543 U.S. 220 (2005), a framework has developed by which a court determines the appropriate sentence. First, the sentencing court must properly calculate the advisory range of imprisonment under the Sentencing Guidelines. Gall v. United States, 552 U.S. 38, 49-50 (2007). After

calculating the range, the district court must "giv[e] both parties an opportunity to argue for whatever sentence they deem appropriate" and "then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Id. at 49-50.

The factors to consider are listed in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense; the need for the sentence to promote respect for the law; the need for the sentence to provide just punishment for the offense; the need for the sentence to afford adequate deterrence to criminal conduct; the need for the sentence to protect the public from further crimes of the defendant; the need to provide the defendant with needed training, care, or treatment; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

A.    The Nature and Circumstances of the Offense

The Defendant's criminal conduct charged in the Indictments spanned many years and involved several schemes to defraud numerous individuals, entities and government agencies, causing millions of dollars in losses. Most egregiously, the Defendant defrauded those individuals closest to him: his father (Ronnie Thomas), wife (Cheryl Stone) and father-in-law (William Stone). The defendant preyed on his father's trust, taking advantage of the long-standing business relationships his father

17

had cultivated to lure other victims into his schemes. Robert Puckett, one of Ronnie Thomas's most loyal employees, explained that the Defendant's "actions and betrayal left [Ronnie Thomas] a broken man and contributed to his passing early April 2015." Letter from Robert Puckett at 4 (attached as Exhibit 3). The Defendant's actions "would eventually bankrupt [Ronnie Thomas] personally and the company he had worked so tirelessly to make it successful." Id. at 2. Sara Conti, the court appointed bankruptcy trustee, similarly stated: Ronnie Thomas "lost his home, his car, his business, and all his property, and he died soon thereafter." NC&VA Declaration of Victim Losses (attached as Exhibit 4). William Stone also experienced extreme economic hardship and died during this prosecution.

In addition to direct monetary losses, the Defendant's criminal conduct caused collateral damage, fiscally and emotionally. Dealer's Assurance Company (DAC), the entity that reinsured NC&VA's warranties, paid nearly a million dollars in claims NC&VA could not pay. "To add a huge insult to the injuries caused by Mr. Thomas," the bankruptcy trustee sued DAC, forcing DAC to incur more than a million dollars to defend itself. Letter from DAC at 3 (attached as Exhibit 5). The bankruptcy trustee also sued Fidelity, who recently paid $1,062,500 to settle all claims. See Settlement Agreement at ¶ 3 (attached as Exhibit 6).

The Defendant's wife experienced financial ruin and significant psychological harm. She wrote:

> Guilt by association as a 'White Collar Wife' has cost my reputation, caused me shame and ostracism. I have also lost valuable business contacts and associations and possibly jobs because my credibility has been called into question.

18

Cheryl Stone Declaration of Victim Losses at 1 (filed under seal as Exhibit 7).

The Defendant's fraud against the United States Treasury dates back to 1999. Personally, he failed to file income returns and took affirmative steps to conceal his income from the IRS through his use of foreign entities formed by management companies in countries generally known as tax havens. Additionally, he caused others to file false income tax returns based upon the fraudulent documents he issued to them. His wife and father-in-law filed returns for several years, wrongly reporting interest income and paying taxes on monies that were actually returns on their "bad" investments. The Defendant's father signed corporate returns for NC&VA, at the Defendant's urging, which falsely listed assets on the balance sheets that NC&VA no longer held.

    B.    <u>The History and Characteristics of the Defendant</u>

Nothing in the Defendant's history mitigates his culpability in this case. In fact, it is hard to decipher what in the Defendant's history is real or fabricated. The Defendant often embellished his life history. For example, witnesses recounted the Defendant bragging about his educational achievements. The Defendant converted his short attendance in an executive management course at Harvard University into a master's degree in business administration awarded by one of the most highly acclaimed educational institution in the World. In reality, the Defendant had never earned an undergraduate degree and, in his application to attend the executive course, the Defendant listed numerous non-existent business successes and provided at least one forged letter of recommendation. In a similar fashion, the Defendant

falsely claimed he was a diplomat when, in fact, he was stationed abroad as an enlisted Marine.

The evidence clearly shows that the Defendant is a man with no moral compass. Even after the Government discovered his investment and bank fraud schemes, the Defendant continued to live lavishly. He moved to a magnificent estate formerly owned by President Thomas Jefferson, in Charlottesville, Virginia, surrounded by rolling fields, a pond, an underground swimming pool, and an enormous barn to house his two Range Rovers. He made no efforts to help his penniless and ailing father. When she refused to lie to law enforcement for him, he threatened her, verbally and physically. When approached by federal officers with a valid arrest warrant, the Defendant refused to surrender. Instead, he placed himself and others, including his wife, in grave danger when he attempted to flee into the darkness of the night with a loaded firearm. After he was ordered detained, the Defendant took steps, as detailed above, to obstruct justice.

C.  <u>Reflecting the Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment for the Offense</u>

The Government respectfully requests a sentence at the high end of the guideline range to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offenses.

D.  <u>Affording Adequate Deterrence to Criminal Conduct and Protecting the Public from Further Crimes of the Defendant</u>

Courts have recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." <u>United States v. Hauptman</u>, 111 F.3d

48, 52 (7th Cir. 1997). Similarly, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." Id.

While general deterrence is one of the prescribed goals for any sentencing, it occupies an especially important role in sentencing for criminal tax offenses, because criminal tax prosecutions are relatively rare. The Sentencing Commission has issued a policy statement stressing the importance of general deterrence in tax cases:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S. Sentencing Manual, ch. 2, pt. T, introductory cmt. In United States v. Engle, the Fourth Circuit endorsed the Commissions' reasoning:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

21

592 F.3d 495, 502 (4th Cir.), <u>cert.</u> <u>denied</u>, 562 U.S. 838 (2010). With the foregoing in mind, this case presents a real opportunity for the sentence to promote the goal of general deterrence.

In this case, there is a significant need for individual deterrence. The Defendant has exhibited a long history of fraudulent activity, which he continued to engage in while detained in this case. A lengthy sentence is required to protect the public from future crime.

E.   **The Defendant's Motion for a Downward Variance**

None of the factors in Section 3553(a) warrant imposing anything other than a Guidelines sentence, and therefore, the Court should swiftly deny the Defendant's plea for a downward variance based on 3553(a) factors.

WHEREFORE, the Government recommends that the Defendant be sentenced to 262 months' imprisonment and ordered (1) to pay $7,301,468.47 in restitution to the victims and $9,024.26 for the costs of prosecution to the United States Attorney's Office for the Eastern District of North Carolina, and (2) to forfeit $7,282,524.

Respectfully submitted this 18th day of July 2019.

ROBERT J. HIGDON, JR.
United States Attorney

By:    /s/ Susan B. Menzer
SUSAN B. MENZER
Assistant United States Attorney
Criminal Division
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461
Telephone: (919) 856-4099
E-mail: susan.menzer@usdoj.gov
D.C. Bar #421007

JOHN E. HARRIS
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Federal Building, Suite 800
Raleigh, NC 27601-1461
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
E-mail: john.harris5@usdoj.gov
NC State Bar #49253

## CERTIFICATE OF SERVICE

This is to certify that I have this 18th day of July 2019, served a copy of the foregoing upon the Defendant or his counsel in this action electronically via the CM/ECF system.

ROBERT J. HIGDON, JR.
United States Attorney

By:   /s/ Susan B. Menzer
SUSAN B. MENZER
Assistant United States Attorney
Criminal Division
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461
Telephone: (919) 856-4099
E-mail: susan.menzer@usdoj.gov
D.C. Bar #421007


JOHN E. HARRIS
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Federal Building, Suite 800
Raleigh, NC 27601-1461
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
E-mail: john.harris5@usdoj.gov
NC State Bar #49253