IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:16-CR-00298-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **UNITED STATES' RESPONSE** |
| v. | ) | **IN OPPOSITION TO MOTION** |
| | ) | **FOR RETURN OF PROPERTY** |
| TREYTON LEE THOMAS | ) | |

After defrauding his family members and their associates out of millions of dollars, evading taxes for years, obstructing a government investigation, threatening a prosecutor, surreptitiously trying to hide his assets, and being sentenced to nearly twenty-two years in prison, Defendant Treyton Thomas ("Thomas") now asks this Court to order the government to pay *him* more than two million dollars because the government did not "immediately" sell millions of dollars of cryptocurrency at the drop of a hat. Thomas's motion, to put it lightly, misses the mark.

To start with, there are substantial jurisdictional problems with Thomas's two-million-dollar damages claim. He lacks standing to seek damages because his legal interest in the cryptocurrency was extinguished almost two years before the sale. Sovereign immunity also poses a jurisdictional bar.

But beyond the jurisdictional problems, Thomas's claim for damages related to the government's handling of the bitcoin simply ignores the inconvenient realities. From the date the cryptocurrency was preliminarily forfeited to the United States to the date it was sold, the cryptocurrency *appreciated* in value by more than *ten million dollars*—all to Thomas's benefit, as this appreciation virtually wiped out his financial

1

obligations in this criminal case. In short, Thomas has not been damaged in the slightest.

Furthermore, there was simply no legal requirement or governmental duty to sell the cryptocurrency at a specific time (whether "immediately" as Thomas urges, or otherwise) or at a specific price. At *most*, the government's duties with respect to Thomas were to act in accordance with good faith and fair dealing. And that is exactly what happened. The United States sold the cryptocurrency for market price (the high end of the day's price range) and in less than six weeks from the authorizing order's entry; the thirty-nine days between the order authorizing the sale and the liquidation, moreover, was the product of reasonable administrative processes related to government procurement. Now that the cryptocurrency liquidation has satisfied the forfeiture judgment and nearly all of the restitution order, the United States expects to process the return of approximately $393,000 in other preliminarily forfeited assets to Thomas once the last few collection details are finalized. Accordingly, the Court should deny Thomas's motion for return of property.

## BACKGROUND

Treyton Thomas executed an egregious financial fraud scheme that cost his family members, his father's business, and numerous other businesses and creditors millions of dollars. *See* Presentence Investigation Report ("PSR") ¶¶ 11–68 [D.E. 122]. He also systematically evaded taxes for two decades. *Id.* ¶¶ 69–80. After extensive negotiations, pursuant to a written plea agreement, Thomas ultimately pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343 and one count

of tax evasion in violation of 26 U.S.C. § 7201. [D.E. 95.] As part of his plea agreement, Thomas agreed to court-ordered victim restitution and separately agreed to voluntarily forfeit and relinquish to the United States $7,282,524.00, which included $322,085.37 in directly forfeitable assets seized from his company's brokerage account during the investigation. *See* Plea Agreement, § 2.b (restitution); § 2.e (forfeiture).

During the criminal proceedings, the government learned that Thomas had undertaken extensive efforts to hide assets from the government post-indictment. Specifically, Thomas used individuals he met in prison to attempt to retrieve, move, or shield assets that he had stashed in various places. One of these individuals estimated that she and her husband had been paid (or taken) nearly $160,000.00 from Thomas as part of these efforts. PSR ¶ 82–83. Another individual produced a handwritten document that listed Thomas's assets, including the private key and access instructions for cryptocurrency held by Thomas at cryptocurrency trading platform Coinbase, and said that Thomas had promised him 25% of the cryptocurrency for his assistance in moving the cryptocurrency. [*See, e.g.*, D.E. 115, at 7, ¶ 19; *see also* Tr. of Motion Hearing, D.E. 133, at 25:10–34:25 & Gov. Ex. 2.] Before obtaining this document during its continuing investigation, the government had directly requested that Thomas provide key and access information regarding the cryptocurrency at Coinbase, but he denied knowledge of such information. [*See, e.g.*, D.E. 108, at 3, ¶ 6 & n.1.]

Ultimately, the government's continuing investigation allowed it to identify and eventually recover the following assets that belonged to Thomas: (1) approximately 279.543012 bitcoin and 279.543012 bitcoin cash held through Coinbase; (2) $21,386.82 in a Wells Fargo account; (3) $311,505.29 that Thomas had stashed in escrow accounts at a title company; and (4) $74,393.99 in funds held by Thomas in a PayPal account under an alias (collectively, the "Substitute Assets").

On July 2, 2019, in advance of sentencing, the United States filed an Amended Motion for Issuance of Preliminary Order of Forfeiture. [D.E. 131.] Consistent with Thomas's plea agreement, the government sought forfeiture of the $322,085.37 in directly forfeitable assets and a forfeiture judgment in the amount of $6,960,438.63. The total of these two amounts equaled the agreed-upon forfeiture amount in the plea agreement. [D.E. 95]. In accordance with Rule 32.2(a)(2)(A), the government also requested that the Court preliminarily forfeit the Substitute Assets and provided a declaration in support thereof. [D.E. 131-1.]

As of July 2, 2019, the total value of the forfeiture money judgment far exceeded the total value of the Substitute Assets. In the PSR, the U.S. Probation Office estimated that the value of the cryptocurrency held by Thomas was $1,164,700.18. PSR ¶ 109. In the declaration submitted by the United States in support of its Amended Motion for Preliminary Order of Forfeiture, IRS-Criminal Investigations SA Bennett Strickland explained to the Court that the value of bitcoin and bitcoin cash routinely fluctuates, often by significant amounts even during a single day, but stated that the estimated value as of his declaration was

4

$2,906,167.52, which was consistent with publicly available pricing data.[1] [D.E. 131-1, at 8, ¶ 30.] Combined with the other Substitute Assets, the total estimated value of the Substitute Assets as of the entry of the Preliminary Order of Forfeiture was $3,313,453.62—$3.6 million *less* than the $6,960,438.63 forfeiture judgment.

The Court entered the Preliminary Order of Forfeiture (the "Preliminary Order") the same day the government filed its motion—July 2, 2019.  [D.E. 132.] Pursuant to Thomas's plea agreement, and as allowed by Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, the Preliminary Order was final as to Thomas *upon entry* on July 2, 2019.  [D.E. 132, at 3, ¶ 3.]

The Preliminary Order authorized the government to bring the forfeited assets into government custody, and the United States ultimately was able to obtain 279.54265708 bitcoin and 17.58531728 bitcoin cash from Coinbase.  The balance of the preliminarily forfeited bitcoin and bitcoin cash was inaccessible due to technological issues associated with the security requirements for the digital products in which the cryptocurrency was "held," and it was never brought into custody.[2]

---

[1] As of July 2, 2019, the bitcoin price fluctuated between $9,761.25 and $11,383.69 that day.  *See* Bitcoin, https://www.coindesk.com/price/bitcoin/.  The price of bitcoin cash similarly fluctuated that day between $387.87 and $416.18.  *See* Bitcoin Cash, https://www.coindesk.com/price/bitcoin-cash/.  All told, the total value of the forfeited cryptocurrency fluctuated between $2,837,116 and $3,298,571 on July 2, 2019.

[2] The United States was informed that while it was theoretically possible to obtain access to these assets, it would likely require the services of a software engineer to specifically design software to allow these assets to be accessed and transferred.  The United States has informed Thomas that it is willing to execute a release of its interest in any assets still held at Coinbase now that the forfeiture judgment and restitution order are able to be satisfied from assets currently in the United States' custody.

Notwithstanding his appeal waiver in his plea agreement, Thomas appealed on various grounds, some of which implicated issues related to asset recovery and Thomas's obstructive efforts. *United States v. Thomas*, 816 F. App'x 839 (4th Cir. 2020). On August 14, 2020, the Fourth Circuit affirmed and otherwise dismissed the appeal of Thomas's sentence as barred by the appellate waiver in the plea agreement. *Id.*

After his convictions and sentence were affirmed, the United States filed a motion for interlocutory sale of the preliminarily forfeited cryptocurrency assets in advance of filing a motion for a final order of forfeiture. [D.E. 174.] The United States was still in the process of meeting the requisite publication requirements related to the preliminarily forfeited cryptocurrency but sought to liquidate the cryptocurrency in the interim due to the substantially increased value of the cryptocurrency and risk of value fluctuation. [*See* D.E. 174, at ¶¶ 4, 7.] The Court did not act on this motion.

Once publication requirements were completed and no third-party claims were filed, the United States then moved for a final order of forfeiture and turnover order on April 1, 2021 authorizing the government to liquidate the cryptocurrency. [D.E. 176.] By this point in time, the value of bitcoin and bitcoin cash had grown substantially from the time they had been preliminarily forfeited. As of April 1, 2021, while prices fluctuated throughout the day, bitcoin traded between $58,314.57 and $59,890.37 and bitcoin cash traded between $530.82 and $561.26. *See* Bitcoin, https://www.coindesk.com/price/bitcoin/; Bitcoin Cash, https://www.coindesk.com/

price/bitcoin-cash/. Thus, the total value of the cryptocurrency assets of April 1, 2021 was between approximately $16.4 million and $16.9 million.

Although Thomas's interests in the cryptocurrency had been entirely extinguished by the Preliminary Order, because the cryptocurrency had been forfeited as substitute assets, and it was likely (although not certain) that the value of the cryptocurrency upon liquidation would yield in excess of the $6,960,438.63 forfeiture judgment, the United States requested that any additional net proceeds *over* the amount of the forfeiture judgment be turned over to the Clerk of Court and applied to the Defendant's then-outstanding restitution obligation of approximately $7,310,592.53. [D.E. 176.] Thus, the United States requested permission to liquidate the seized cryptocurrency to obtain up to the combined amount of the forfeiture judgment and restitution order—*i.e.*, $14,271,031.16. [*Id.*]

Because it was possible that the value of the cryptocurrency might exceed $14,271,031.16 at liquidation, the United States also included in its proposed order that to the extent any bitcoin, bitcoin cash, and/or net proceeds from the sale of the cryptocurrency remained in government custody, the United States, barring further court order, would be required to take reasonable steps to return said property to the defendant. [*Id.*]

The Court entered the requested Final Order of Forfeiture and Turnover Order (the "Final Order") on April 5, 2021. [D.E. 177.] The order was forwarded to the U.S. Marshals Service (the "USMS"), who was holding the cryptocurrency for the benefit of the Internal Revenue Service ("IRS"), the seizing agency. The USMS ultimately

7

liquidated the cryptocurrency on May 14, 2021, approximately thirty-nine days after entry of the Final Order.

As explained below, this amount of time to liquidate the cryptocurrency was in no way unreasonable. However, the timing of sale was largely driven by procurement-related issues that were pending when the Final Order was entered. Specifically, in April 2021, the USMS was in the process of negotiating a contract to obtain a single nationwide vendor to handle disposition of all cryptocurrency. As government counsel advised counsel for Thomas, the USMS was not directly liquidating cryptocurrency, as it reasonably expected to turn over custody and disposition to the contract awardee once the contract was finalized. However, after this contract was awarded on or about April 21, 2021, the contract award was subject to a protest.[3] Once it became clear the protest would delay the transfer of disposition services to the national vendor, the USMS again began directly liquidating cryptocurrency assets through cryptocurrency exchanges. Accordingly, the USMS liquidated the bitcoin on May 14, 2021.

The liquidation was successful in terms of achieving market rates on the day of liquidation. The bitcoin was ultimately liquidated for an average per-bitcoin price of approximately $50,968.21, with a cost of 10 basis points, producing net proceeds of $14,233,536.32. The price of bitcoin opened at $49,493.55 on May 14, 2021 and closed at $49,906.93, *see* Bitcoin, https://www.coindesk.com/price/bitcoin/; accordingly, the

_____

[3] Ultimately, the protest was successful, and the contract was recently awarded to another vendor. *See, e.g.*, https://www.coindesk.com/policy/2021/08/05/why-us-government-yanked-bitgos-contract-and-gave-it-to-anchorage/.

United States obtained the high end of the trading price range that day. Furthermore, on the day it processed the liquidation order, the USMS set a sell-limit of $49,500, meaning that the cryptocurrency would not be sold below that price. As the above shows, the USMS average sale price exceeded the sell limit by nearly $1,500 per bitcoin.

The liquidation of the bitcoin cash proceeded in similar fashion. It was liquidated for an average per-bitcoin-cash price of approximately $1,334.00 with a cost of 20 basis points, for net proceeds of $23,411.89. The price of bitcoin cash opened at $1,241.01 that day and closed at $1,284.92, *see* Bitcoin Cash, https://www.coindesk.com/price/bitcoin-cash/; accordingly, the United States again obtained the high end of trading value for the bitcoin cash that day.

The total combined net proceeds from the liquidation of the cryptocurrency was approximately $14,256,948.21. Consistent with the Final Order, these funds were applied first to the outstanding forfeiture judgment. Then, on or about July 29, 2021, the excess ($7,296,509.59) was deposited with the Clerk of Court for disbursement to victims pursuant to the Court's restitution order. This left an outstanding restitution balance for Thomas of approximately $14,032.94.

On August 16, 2021, Thomas filed a motion arguing that because the government did not "immediately" sell the cryptocurrency for a higher price, he is entitled to a "return" of $2,237,762, plus the return of the other $407,286 in preliminarily forfeited assets. [D.E. 185]. Thomas also asks the Court to declare his

9

criminal penalties in this case satisfied.  [D.E. 185.]  For the reasons explained below, the Court should deny Thomas's motion.

## ARGUMENT

Citing virtually no legal authority and casting himself as the victim of purported constitutional violations, Thomas asserts that the government should have sold millions of dollars of bitcoin at a moment's notice and at a specific price.  The government's failure to do so, he claims, means this Court should require the government to pay him approximately $2.2 million in damages and extinguish his remaining restitution obligations.

The Court should reject Thomas's baseless assertions for several reasons.  As an initial matter, the Court lacks jurisdiction to entertain Thomas's damages claim.  But even if the Court has jurisdiction, the government owes Thomas nothing related to the cryptocurrency disposition.  While in government custody, the cryptocurrency's value did not depreciate; it *appreciated* by more than *ten million dollars*.  What is more, every single dollar of that ten-million-dollar-plus appreciation inured to *Thomas's* benefit by being applied to his outstanding forfeiture and restitution obligations in the criminal case.  In any event, the government cannot be held liable for damages because it acted fairly and reasonably in liquidating the cryptocurrency after the Court entered the Final Order.  Thomas's contentions to the contrary ignore practical administrative realities as well as the volatility of the cryptocurrency markets.  To the extent the government owed *any* duty to Thomas in liquidating the bitcoin, it discharged it appropriately by acting in good faith to achieve a market-rate

sale at the high-end of the day's trading range within a reasonable amount of time under the circumstances.

As a result of the substantial appreciation of the bitcoin while in the government's custody, and pursuant to its agreement with Thomas, the government anticipates that Thomas's obligations in this criminal case will soon be satisfied. The government then anticipates processing approximately $393,000 for return to him from the assets that were preliminarily forfeited but will no longer be necessary to satisfy his forfeiture judgment (or restitution obligations).

## I. The Court lacks jurisdiction to award Thomas the damages he seeks.

Although Thomas styles his motion as a "Motion for Return of Untainted Property," the motion in reality consists primarily of a claim for damages based on what is essentially a waste theory; that is, Thomas seeks damages in the amount of $2,237,762 for alleged depreciation in the value of the forfeited cryptocurrency that he claims was the result of the government's unreasonable delay in liquidation. The motion cannot be one for "return of property" as Thomas suggests because there is simply no $2,237,762 to "return." Rather, this amount represents funds that Thomas asserts the government should have, but did not, obtain. The government cannot be ordered to "return" property that is not (and in this case never was) in its possession. *See, e.g.*, *United States v. Barefoot*, No. 5:05-CR-166-BO, 2015 WL 3649786, at *2 (E.D.N.C. June 11, 2015).

Thomas's damages claim, however, runs headlong into two jurisdictional hurdles that it cannot clear. First, Thomas lacks standing to seek damages related to the cryptocurrency sale. Second, even if he had standing, the Court lacks

jurisdiction to order the United States to pay Thomas damages because of sovereign immunity.

### A. Thomas lacks standing to seek damages related to the cryptocurrency liquidation.

Thomas claims that the Court must order the government to pay him $2,237,762 "to achieve the objective of the Court's April 5, 2021 order and avoid inflicting financial injury upon the defendant." D.E. 185, at 11. But in arguing that the government's actions somehow inflicted "financial injury" on him or that the Court's Final Order affected *his* interests in the cryptocurrency, Thomas fundamentally misunderstands relevant forfeiture law. Specifically, Rule 32.2 of the Federal Rules of Criminal Procedure makes abundantly clear that Thomas had no interest in the cryptocurrency when it was liquidated because his interest was extinguished in its entirety as of July 2, 2019.

As relevant here, under Rule 32.2(b)(1)(A) and (2)(A), after a plea of guilty is accepted and after determining what property is subject to forfeiture under the applicable statute, the Court must enter a preliminary order of forfeiture forfeiting specific property, entering a money judgment, and forfeiting substitute property. This preliminary order of forfeiture "becomes final as to the defendant" no later than at sentencing, "or at any time before sentencing if the defendant consents." *Id.* 32.2(b)(4)(A). Thereafter, it remains preliminary *only* as to third parties. *Id.* 32.2(b)(4)(A). This is why, for instance, "a criminal defendant may appeal a preliminary forfeiture order, but he may not appeal a final forfeiture order entered thereafter." *United States v. Earquhart*, 776 F. App'x 802, 803 (4th Cir. 2019)

(collecting cases); *see also United States v. Wallis*, 454 F. Supp. 3d 589, 593 n.3 (E.D. Va. 2020) ("Courts uniformly recognize that an order of forfeiture terminates a criminal defendant's interest in a forfeited property.").

Here, the Court followed Rule 32.2 to the letter. It entered a Preliminary Order of Forfeiture on July 2, 2019. [D.E. 132.] The Preliminary Order included bitcoin and bitcoin cash as substitute assets to be forfeited to satisfy the substantial money judgment the order imposed, and at that time, consistent with 21 U.S.C. § 853(p), the cryptocurrency did not exceed the value of the money judgment. [D.E. 132, at 1–2; D.E. 131-1, at 8.] In accordance with Thomas's plea agreement, *see* D.E. 95, § 2.e, the Preliminary Order was final as to Thomas *upon its entry* on July 2, 2019. [D.E. 132, at 3–4.] Accordingly, Thomas's interest in the bitcoin and bitcoin cash listed in the Preliminarily Order was "conclusively determine[d]" as of July 2, 2019 and his interest therein was "terminated." *Wallis*, 454 F. Supp. 3d at 593 & n.11. Thomas appealed, but did not expressly challenge the Preliminary Order and never moved to stay it. And in any event, the Fourth Circuit affirmed in part and dismissed the remaining appeal. *United States v. Thomas*, 816 F. App'x 839 (4th Cir. 2020).

As a result, as of July 2, 2019, Thomas's interest in the cryptocurrency was completely forfeited to the United States. He simply had no legal interest in the cryptocurrency thereafter, and therefore has no standing to claim that the government's disposition of the cryptocurrency in May 2021 caused him any sort of "financial injury." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("the irreducible constitution minimum of standing" requires "an 'injury-in fact'—an

13

invasion of a legally protected interest"). Similarly, the "objective" of the Final Order with respect to forfeiture was to adjudicate any *third-party* rights in the cryptocurrency; because no claims were asserted, it served to give the United States clear title to the cryptocurrency as against *the rest of the world*, just as the Court had already forfeited Thomas's interest to the government in 2019.

Furthermore, the Final Order's provision requiring the government to "take reasonable efforts to return" excess property to Thomas did not create a legal interest in the cryptocurrency that would support a damages award. Critically, that provision in the Final Order was *conditional*; it only applied "to the extent that any bitcoin, bitcoin cash, and/or Net Proceeds from the sale of the Forfeited Currency or Additional Cryptocurrency remain in government custody" *after* the sale and deposit of net proceeds to satisfy the forfeiture judgment and restitution order. [D.E. 177, at ¶ 7.] Here, no such bitcoin, bitcoin cash, or net proceeds remained in government custody. Rather, all of the net proceeds were applied to the forfeiture judgment or to restitution. Nothing else in the Final Order gave Thomas any property interest in the cryptocurrency or otherwise established that the government owed any duty to Thomas in its disposition.

To the extent Thomas has *any* legal interest in this matter, that interest would be in ensuring that he received appropriate credit for the forfeited asset against his forfeiture judgment. But even the case Thomas himself cites holds that "[t]he law entitles [the defendant] to credit only from the net proceeds from the sale, however— not, as he argues, the properties' value at some earlier point in time." *United States*

14

*v Sheth*, No. 09 CR 69-1, 2017 WL 66820, at *10 (N.D. Ill. Jan. 6, 2017). So there is no injury to such an interest when the government does what it did here—sell property and credit the net proceeds against the forfeiture judgment. Indeed, in this case, Thomas has received *full credit* and his forfeiture judgment has been fully satisfied. There is no more credit to give and thus, to the extent Thomas had such a viable interest in having his forfeiture judgment appropriately credited, there has been no injury to that interest in this case.

For these reasons, Thomas lacks standing to seek damages arising from the government's liquidation of assets in which he had *no* interest, and the Court should deny the motion on that basis.

### B.     Sovereign immunity bars Thomas's damages claim.

Thomas's damages claim suffers from a second, independent jurisdictional defect: it is barred by sovereign immunity. In *United States v. Jones*, 225 F.3d 468, 469–70 (4th Cir. 2000), the Fourth Circuit affirmed the district court's determination that it lacked jurisdiction to award damages for property that had been seized by the government and destroyed or disposed of without a valid forfeiture proceeding. *Id.* at 469. As the Court explained, "[s]overeign immunity deprives a court of jurisdiction" over a motion to recover damages for the value of seized property, absent waiver by "an unequivocal and express act of Congress." *Id.* at 469–70.

In *United States v. Silvers*, the district court noted that jurisdiction over a claim much like Thomas's was "questionable" on similar grounds. 932 F. Supp. 702, 704 (D. Md. 1996). In that case, the government had initiated a parallel, *in rem* civil

forfeiture action alongside a criminal case. *Id.* The government and the defendant ultimately agreed on a sale of the home in the forfeiture case, with the home to be released to the lienholder in return for a payment of $2,500 to the United States. *Id.* The lienholder would then auction the property, with the proceeds to be first applied to outstanding liens, then to pay the government's maintenance costs and fees, and then to pay the defendant's reasonable attorney's fees. *Id.* The defendant subsequently filed a motion claiming that the government was liable for depreciation of the home between the time of seizure and the time of sale, contending, just like Thomas in this case, that the value of the home had depreciated while in government custody by $80,000 to $100,000. *Id.*

Although the Court ultimately concluded that it would decide the case because the law clearly established that the government was not liable, it nevertheless explained why it arguably lacked jurisdiction over the case. *Id.* Namely, the court noted that the depreciation claim sought damages of more than $10,000 from the United States, which meant that the district court would have jurisdiction under 28 U.S.C. § 1346(b) *only if* the claimant complied with the provisions of the Federal Tort Claims Act. *Id.*

The *Silvers* analysis applies equally here. Thomas seeks more then $2.2 million in damages from the United States based on purported depreciation of an asset allegedly caused by an unreasonable delay in liquidation. The claim exceeds $10,000, and Thomas has not complied with the Federal Tort Claims Act. Thus, the district court lacks jurisdiction to award such damages because of sovereign

16

immunity. Notably, this is the very analysis applied by the Fourth Circuit in *Jones* to property that was destroyed or disposed without *any* valid forfeiture proceeding. By contrast, here, there was a valid forfeiture proceeding and the property was disposed of in accordance with a court order. The government has certainly not waived any sovereign immunity with respect to a multi-million-dollar claim for damages arising from the court-ordered sale of forfeited property.

Thus, the Court may not only deny the motion for lack of standing but may also deny the requested relief as barred by sovereign immunity.

## II.     Thomas's damages claim is meritless.

Notwithstanding the jurisdictional defects in Thomas's damages claim, the law very clearly establishes that the government is not liable on the merits for at least two reasons.[4] *First*, the cryptocurrency *appreciated*, not depreciated, while in government custody; accordingly, the damages claim Thomas raises based on an alleged waste is entirely meritless. *Second*, the government acted in good faith and in a reasonable manner in its disposition of the bitcoin.

### A.     The property appreciated while in government custody.

As a simple matter of undisputed fact, the cryptocurrency at issue in this case appreciated by more than ten million dollars between July 2, 2019 (the date it was forfeited to the United States) and May 14, 2021 (the date the United States sold it). This fact alone renders Thomas's damages claim untenable. The government simply

---

[4] The government submits that, as in *Silvers*, the law so clearly establishes that the government is not liable for the damages Thomas seeks that the Court may deny the motion on the merits without resolving the jurisdictional questions. *See United States v. Silvers*, 932 F. Supp. at 704 (citing *Norton v. Mathews*, 427 U.S. 524, 530–31 (1976)).

cannot be deemed to have unreasonably handled an asset when its value while in government custody appreciated by millions and millions of dollars, all of which inured to *Thomas's benefit*.

Rendering Thomas's argument all the more absurd is the fact that the United States could have sought a final order of forfeiture and sold the cryptocurrency at a much earlier date, which would have ultimately yielded *far less* for Thomas. For example, had the United States obtained a final order of forfeiture in October 2020 and liquidated the cryptocurrency on the *very same day* the order came down, it would likely have only netted between $3 million and $3.8 million. The United States would have been entirely within its rights to do so, and Thomas would still owe *ten million dollars* in forfeiture and restitution. Thomas now has gained the benefit of more than $14 million being applied to his forfeiture judgment and restitution judgment, virtually wiping these obligations out altogether, but claims the government has violated his constitutional rights in its handling of the cryptocurrency.

This example exposes the true crux of Thomas's argument, which has little to do with *when* the government liquidated the bitcoin and instead is rooted in his mistaken view that the government owed him a duty to sell the cryptocurrency at a specific time or specific price. There simply is no such duty. The United States' goal all along was to maximize the value of the forfeited assets, but it simply had no fiduciary duty *to Thomas* to sell at any time or at any price.

The best case that Thomas can muster even says so. In *United States v. Sheth*, No. 09 CR 69-1, 2017 WL 66820 (N.D. Ill. Jan. 6, 2017), the Court, based on a plea

18

agreement quite different than the agreement here, imposed only a duty of good faith and fair dealing on the government in connection with sale procedures of forfeited assets.[5] But even then, the court held that "[t]he law entitles [the defendant] to credit only from the net proceeds from the sale, however—not, as he argues, the properties' value at some earlier point in time." *Id.* at \*9. It further held that "the duty of fair dealing does not require the government to take extraordinary measures to protect the equity in [forfeited] properties without a motion from the defendant to sell the assets." *Id.* at \*10. And it found a multiple-month delay between the order authorizing sale and the actual sale to comport with the duty of good faith and fair dealing. *Id.* at \*10.

In sum, setting aside the jurisdictional defects, and without even delving into the specifics of the disposition (described below), Thomas's damages claim can be easily disposed of because of the massive appreciation of the cryptocurrency while in the government's hands. A waste-like damages claim will simply not lie when no waste has occurred, and when the government owes no other duty to Thomas. If anything, the substantial appreciation confirms that the government acted in good faith and dealt fairly with Thomas.

---

[5] Notably, in this case, the Court previously found that the defendant had *breached* his plea agreement with the United States in connection with his obstructive activity, and the Fourth Circuit affirmed. *See Thomas*, 816 F. App'x at 840 ("We further conclude that the Government was free to assert that a downward adjustment for acceptance of responsibility was unwarranted after Thomas failed to meet his obligations under the plea agreement.").

19

## B.    The government's liquidation was commercially feasible and entirely reasonable.

Even if the cryptocurrency had not appreciated by millions of dollars while in government custody, the United States acted reasonably in its liquidation of it.

As an initial matter, the relevant legal standard established by Congress for the liquidation of forfeited assets is a relatively low bar. It requires only that the Attorney General "direct the disposition by the United States . . . of all property ordered forfeited under this section by public sale *or any other commercially feasible means*." 21 U.S.C. § 853(i)(4) (emphasis added); *see also* 21 U.S.C. § 881(e) (authorizing the Attorney General to "sell, by public sale or *any other commercially feasible means*, any forfeited property which is not required to be destroyed by law and which is not harmful to the public"). There is no statutory or regulatory provision establishing a specific timeline or price requirement for disposing of forfeited assets, and Thomas has not pointed to one.

Similarly, the Final Order only directed the United States "to dispose of the Forfeited Cryptocurrency according to law, including by selling or exchanging the Forfeited Currency for U.S. dollars." D.E. 177, at 3, ¶ 1. Likewise, it simply "authorized" the United States to sell or exchange the additional cryptocurrency up to the restitution amount. D.E. 177, at 4, ¶ 3. Nowhere did the Final Order establish a specific deadline, price, or means of disposal.

Ignoring these realities, Thomas bases his damages calculation on the unfounded assumption that the United States should have liquidated the cryptocurrency the same day the Court issued the Final Order. Specifically, he claims

that "the bitcoin should have been sold *immediately*." D.E. 185, at 10 (emphasis added).

This argument simply ignores administrative realities. The USMS, the entity ultimately responsible for liquidating the bitcoin, cannot be required to dump millions of dollars of cryptocurrency in an instant. Rather, less than forty days to process the Final Order and liquidate the cryptocurrency is entirely reasonable—whatever the reason for such a time period.

But thirty-nine days was particularly reasonable in this case, where procurement-related issues were part of the reason that liquidation took place when it did. Namely, as the government advised Thomas's counsel, the USMS was working to finalize its national cryptocurrency-disposition contract around the time the Final Order was entered. The original hope was that the vendor would be able to take over all cryptocurrency liquidations, including the one in this case, in short order. However, when the contract award in mid-April was protested, and the USMS knew it would not be able to rely on the vendor to take up liquidations, the USMS resumed direct liquidations, resulting in the May 14, 2021 liquidation in this case. This course was entirely reasonable under the circumstances.

Thomas's arguments also ignore the reality of fluctuating bitcoin value. The government has no control over the value of bitcoin; it is subject to market fluctuations just like everybody else. It discharged its duty to sell the cryptocurrency in a commercially feasible manner by using a third-party exchange platform to sell

the cryptocurrency. And it got *market price* on the day it sold—in the high range, on average, of the trading price for May 14, 2021.[6]

Furthermore, Thomas's time-and-price arguments simply do not hold up when looking at price volatility during the time frame between the Final Order and the liquidation. For example, had the government liquidated the bitcoin on April 7, 2021, just *two* days after the Final Order was entered, it would have likely netted about $900,000 less than Thomas claims it should have netted (and that he is purportedly *constitutionally* entitled to). *See* Bitcoin, https://www.coindesk.com/price/bitcoin/. Similarly, on April 23, 2021, about three weeks before the liquidation, bitcoin was trading for $47,876.26—approximately $3,000 *less* than the amount the government ultimately sold it for. *Id.* In other words, an *earlier* sale might have resulted in *less* proceeds.

Finally, although Thomas has not come right out and said it, the thrust of his argument is that the government acted in bad faith by waiting to sell the bitcoin until the price had fallen from the $59,057 and other higher prices prevailing shortly after the entry of the Final Order. *See* D.E. 185, at 10 (citing *Sheth*, 2017 WL 66820). Specifically, he asserts that the government should have imposed a sell-limit of

---

[6] This is entirely consistent with government counsel's communications with Thomas's counsel, which Thomas cites in his motion. D.E. 183, at 7, 10. Thomas's counsel had expressed concern that a single sale or auction of a large volume of cryptocurrency may result in below-market prices and thus reduce the amount credited to Thomas's obligations. Government counsel explained that, historically, the government was able "to achieve very close to market prices for bitcoin sales, including the sale of large volumes of cryptocurrency" and that "I certainly expect this to be the case when the bitcoin at issue here is liquidated." D.E. 183, at 7. That is exactly what happened. The government obtained market prices (the high range for the day), well above the sell-limit it set when it placed the sale order.

22

$60,000 to prevent the sale of the cryptocurrency below that price. D.E. 185, at 6–7, 9. As an initial matter, Thomas does not get to dictate the sale price of assets that he has no legal interest in; and rejecting such an effort does not itself constitute bad faith. But in this case specifically, imposing such a sell-limit, as history has borne out, would have been inappropriately inflexible; indeed, it would have been commercially *unreasonable* given the cryptocurrency's price volatility. For example, at the time the $60,000 sell-limit request was made, the USMS was still working out the timeline for liquidation. If the price of bitcoin had fallen below $60,000 before the USMS was in a position to have the cryptocurrency liquidated, the USMS would have not been able to liquidate. Ultimately, that is exactly what happened. Less than two weeks after the entry of the Final Order, and before the USMS was in a position to liquidate, the price of bitcoin fell below $60,000. *See* Bitcoin, https://www.coindesk.com/price/ bitcoin/. It does not appear to have hit $60,000 again since. *Id.* Had the government set the agreed-upon sell-limit, the USMS would still be holding onto the bitcoin. The forfeiture judgment would remain unsatisfied. Restitution would remain unpaid. And the government would bear the risk that the value of bitcoin would drop precipitously.[7] The government's decision to reject Thomas's proposed sell limit was thus reasonable and fair under the circumstances and certainly not evidence of any bad faith.

---

[7] Notably, such a drop off occurred later in May 2021 and continued until July 2021, when the price of bitcoin fell below $30,000. *See* Bitcoin, https://www.coindesk.com/ price/bitcoin/. The price has rallied since then, but as of September 9, it is not trading on average at the price the United States obtained when it liquidated the bitcoin. *Id.*

The government did not otherwise act in bad faith towards Thomas. It did not, for example, have any sort of "running" limit that *prevented* the sale of the cryptocurrency at a higher price. It did not intentionally hold the sale until the price fell. Indeed, the government bore the risk that the bitcoin market could drop substantially and prevent it from recovering the full amount of Thomas's liabilities as it hoped to do. Moreover, counsel for the government repeatedly kept Thomas's counsel advised of the status of the liquidation process, explained the procurement issues recited above, and let Thomas's counsel know once the liquidation was confirmed, including the relevant average price of the sale. To the extent the government owed Thomas any duty of good faith and fair dealing, he got exactly that.

The bottom line on Thomas's damages claim is that he was not damaged by the government's conduct; indeed, he benefited by millions of dollars. And regardless, the government acted reasonably and in accordance with the law in disposing of the cryptocurrency. His claim to the contrary should be firmly rejected.

### III. The government anticipates returning approximately $393,000 and has already agreed to release to Thomas any interest in the non-seized bitcoin cash.

Beyond his $2,237,762 damages claim, Thomas also asks the Court to order the government to return $407,286 in other preliminarily forfeited funds and inaccessible bitcoin cash. The United States will address each of these in turn.

With respect to the inaccessible bitcoin cash, the government was unable, for technological reasons, to bring the bitcoin cash into its custody from Coinbase. As explained earlier, the Court cannot order the government to return what it does not have (and has never had). *United States v. Barefoot*, No. 5:05-CR-166-BO, 2015 WL

24

3649786, at *2 (E.D.N.C. June 11, 2015). The Court should therefore deny this motion. Nevertheless, the government has already advised Thomas's counsel that it is willing to release any interest it obtained in the bitcoin cash as a result of the Preliminary Order back to Thomas and would sign a release to that effect if necessary to allow Thomas to attempt to access the bitcoin cash. Accordingly, Thomas's motion is effectively moot.

With respect to the remaining $407,286 in preliminarily forfeited substitute assets still in government custody, as reflected in Thomas's motion, the United States and Thomas have agreed that Thomas will consent to a turnover order allowing approximately $14,000 from these funds to be applied to his remaining outstanding restitution balance, at which point both his forfeiture money judgment and restitution obligations will be satisfied in full. *See* D.E. 185, at 9 n.3. If entered, the United States expects to process the turnover of the approximately $14,000 from the custodial agency to the Clerk's Office. Once that occurs, and barring any other court order, the United States plans to process the remaining balance of preliminarily forfeited funds (approximately $393,000) for return to Thomas, subject to any offsets for other debts to the United States that may exist separate from this criminal case. The United States further expects at that point to file notices of satisfaction with respect to the forfeiture judgment and the restitution order in due course. To the extent the foregoing is consistent with the relief Thomas seeks with respect to the "other" substitute assets, the United States consents to his request. Otherwise,

because the government has already agreed to the foregoing, the Court should deny the motion as moot.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Thomas's motion to the extent it claims over $2.2 million in damages and seeks the return of property not in the government's custody or control. The United States consents to the return of approximately $393,000 on the terms outlined above, but otherwise requests that the Court deny Thomas's motion.

Respectfully submitted, this 13th day of September, 2021.

G. NORMAN ACKER, III
Acting United States Attorney

BY:    /s/ John E. Harris
       JOHN E. HARRIS
Assistant United States Attorney
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
E-mail: john.harris5@usdoj.gov
NC State Bar No. 49253
*Attorney for United States*

<u>CERTIFICATE OF SERVICE</u>

I certify that I have on this 13th day of September, 2021, served a copy of the foregoing response upon counsel electronically via ECF and/or by electronic mail to counsel at the below-listed addresses:

**BY ECF:**

>   Elliot S. Abrams
>   Cheshire Parker Schneider, PLLC
>   elliot.abrams@cheshirepark.com

**BY ELECTRONIC MAIL**

>   Howard Srebnick, Esq.
>   Black, Srebnick, Kornspan & Stumpf
>   HSrebnick@royblack.com

>                   BY:    /s/ John E. Harris
>                          JOHN E. HARRIS
>                   Assistant United States Attorney
>                   150 Fayetteville Street, Suite 2100
>                   Raleigh, NC 27601
>                   Telephone: (919) 856-4530
>                   Facsimile: (919) 856-4821
>                   E-mail: john.harris5@usdoj.gov
>                   NC State Bar No. 49253